865 F.2d 761
 COAL RESOURCES, INC. No. 11 Coal and Construction, Inc; and
Green Mountain Coal Company, Plaintiffs-Appellees,
Cross-Appellants,
v.
GULF & WESTERN INDUSTRIES, INC.; Virginia Met Coal Company,
Inc.; Jersey Kentucky Coal Company, Inc.; and
New Jersey Zinc Company, Defendants-
Appellants, Cross-Appellees.
 Nos. 86-3824, 86-3825.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 19, 1987.
Decided Jan. 13, 1989.
As Amended on Denial of Rehearing and Rehearing En Banc May
31, 1989.*
 
 Jacob K. Stein (argued), Donald J. Mooney, Jr., Paxton & Seasongood, Cincinnati, Ohio, for defendants-appellants, cross-appellees.
 David P. Kamp, Nancy C. Cody, Vincent B. Stamp, Lead Counsel (argued), Dinsmore & Shohl, Thomas S. Calder, Cincinnati, Ohio, James K. Robinson, Detroit, Mich., for plaintiffs-appellees, cross-appellants.
 Before KENNEDY, RYAN and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant Gulf & Western Industries, Inc., appeals a jury verdict in favor of plaintiff Coal Resources, Inc., in this diversity of citizenship breach of contract action.[1] Defendant acquired the assets of plaintiff under a contract called an Acquisition Agreement. A separate Assumption of Obligations clause was entered into whereby the defendant agreed to assume plaintiff's rights and obligations under certain leases of Virginia coal mining property previously acquired by plaintiff. The jury determined that defendant breached the Assumption of Obligations clause and awarded damages.
 
 
 2
 Prior to the trial, defendant confessed judgment on a claim by plaintiff for a $500,000 payment under a promissory note plaintiff had earlier given a bank and which amount defendant agreed to pay under the Acquisition Agreement. The district court granted pre-judgment interest on the confessed judgment at the actual rate of interest rather than the statutory rate, and denied pre-judgment interest on the jury award. The plaintiff cross-appeals the denial of interest on the jury award.
 
 
 3
 We reverse as to the award of actual interest on the confession of judgment issue, and reverse and remand for a new trial on the contract claim.
 
 I.
 
 4
 This is the third time this case has been considered by this court: an original appeal, a rehearing of that appeal, and this appeal following a second trial. A brief history is necessary to an understanding of the issues.
 
 
 5
 Coal Resources, Inc. (CRI) obtained leases on coal properties in Virginia and Kentucky and began mining operations in the early 1970s. The leases required CRI to "diligently mine" the properties and to pay minimum royalties to the lessors regardless of the amount of coal mined. In 1975, CRI entered into negotiations for the sale of its assets to defendant Gulf & Western (G & W). On July 11, 1976, the parties reached an agreement. CRI's assets were transferred to G & W subsidiaries Virginia Met Coal Company and Jersey Kentucky Coal Company. G & W paid CRI $2.1 million, promised to pay $500,000 one year after the date of the sale on a promissory note CRI owed to a bank, assumed CRI's equipment debt of $1.7 million, and agreed to pay CRI 2.8 times any annual adjusted net profits ("the multiple") of Virginia Met Coal Company for the two years following the sale after deduction of certain amounts already paid and with a maximum limit of $11,666,000. In a separate agreement G & W also assumed CRI's obligations under the leases.
 
 
 6
 After acquiring the leases, G & W was unable to mine the leased property profitably. Eventually G & W lost the leases, either through failure to pay minimum royalties to the lessors, through litigation settlements with its contract miner, or through voluntary surrender. No money was ever paid to CRI under the multiple because Virginia Met Coal operated at a loss. CRI then brought suit.
 
 
 7
 In 1981, following the first trial in this case, the jury found G & W liable for breach of contract, promissory fraud, and securities fraud. The jury awarded CRI more than $17 million in compensatory damages, and more than $11 million in punitive damages and attorneys fees. The trial court ordered a remittitur to $12,050,000 and granted G & W's motion for judgment notwithstanding the verdict on the securities claim.
 
 
 8
 On appeal, this court affirmed originally the judgment dismissing the securities law claim, reversed the judgment on the other claims and remanded those claims for a new trial. CRI then filed a petition for rehearing which was granted. Following supplemental briefing, the original hearing panel affirmed the j.n.o.v. on the securities law claim, reversed the judgment for CRI on the promissory fraud claim, vacated the judgment for CRI on the contract claim, and remanded for a new trial. Coal Resources, Inc. v. Gulf & Western Indus., Inc., 756 F.2d 443 (6th Cir.1985). In the course of its opinion, in a passage that controls the issues before us, the panel stated:
 
 
 9
 We hold that it is unclear what kind of harm the parties intended to protect against through the inclusion of the assumption of obligations clause in the acquisition agreement. On remand, extrinsic evidence will be admissible on this question. If the finder of fact determines that the assumption of obligations clause was breached in that Gulf & Western did not diligently develop the Virginia leaseholds, and if the finder of fact further decides that the purpose of the clause was to insure that Gulf & Western would diligently develop those properties so that Coal Resources would receive substantial payments under the multiple, then an award for breach of contract like the one under review here would be permissible. On the other hand, if the clause was intended to protect Coal Resources from damages resulting from the leases being terminated, then recovery may only be had for those damages proximately resulting from the termination of the Kentucky lease.
 
 
 10
 Coal Resources, Inc., 756 F.2d at 450-51 (footnote omitted).
 
 
 11
 At the second trial the jury again found in favor of CRI on the contract claim and returned an award of $7,850,000 from which G & W appeals.
 
 
 12
 In answer to special questions, the jury specifically found (1) that the purpose of the Assumption of Obligations clause was to insure that G & W would diligently mine the leased properties so that CRI would receive payments under the multiple, and (2) that the Assumption of Obligations clause was breached in that G & W failed to diligently develop the leased properties. G & W asserts that it was entitled to judgment as a matter of law on the duty to diligently mine issue, and that even if it were not, the district court's instructions on the issue and its special questions to the jury were error.
 
 
 13
 G & W also argues that the trial court erroneously (1) limited the parties to two expert witnesses each, (2) foreclosed it from calling two non-expert witnesses it wished to call, and (3) permitted CRI to introduce improper expert opinion testimony that was mere speculation.
 
 
 14
 On the first day of trial, G & W confessed judgment on CRI's claim that G & W failed in its obligation to make the $500,000 payment due one year after the sale. Because the $500,000 payment was to be made to Central Trust Bank on a note on which CRI was the maker, the trial court found G & W liable for the actual interest called for in the note rather than statutory interest.
 
 
 15
 We address first the issues raised in G & W's appeal.
 
 II.
 A.
 Minimum Royalties
 
 16
 G & W's first assignment of error is that it is entitled to judgment as a matter of law because the payment of minimum royalties to its lessors satisfies its contractual obligation to diligently mine the properties. This claim, however, mischaracterizes the issue that was sent back for retrial following the first appeal. This court specifically found that G & W was not entitled to judgment as a matter of law based on the payments of minimum royalties.
 
 
 17
 Gulf & Western's argument that it is entitled to judgment as a matter of law [because a duty of diligent mining cannot be inferred under a contract which has an integration clause and which calls for minimum royalties] is undermined, however, when the express language of the Virginia leases is considered. All of the leases require the lessee to develop the mines in a diligent, workmanlike manner in accordance with the standards of good mining practice. Coal Resources introduced evidence through witness Zegeer that Gulf & Western neither diligently developed the mines nor observed good mining practice in failing either to install deep mines or build a new coal washing facility. Accordingly, Gulf & Western is not entitled to judgment as a matter of law on the breach of contract claim.
 
 
 18
 Coal Resources, Inc., 756 F.2d at 450. Thus, the prior panel held that although Virginia law does not imply a duty of diligent development where minimum royalties are paid, the leases involved herein provided for both a minimum royalty and diligent development of the mines. Id. Therefore, the payment of minimum royalties does not satisfy the duty of diligent development. Id.
 
 
 19
 In remanding the breach of contract issue for a new trial, the previous panel stated:
 
 
 20
 Although [G & W] is not entitled to judgment as a matter of law, ... we are uncertain whether Gulf & Western's alleged failure to discharge its obligation of reasonably diligent development caused injury of a kind that the Assumption of Obligations provision in the Acquisition Agreement was intended to prevent.
 
 
 21
 Coal Resources, Inc., 756 F.2d at 450. The issue for the second trial, then, was not whether minimum royalty payment satisfied G & W's duty under the leases but, rather, whether the Assumption of Obligations clause, requiring G & W to assume, inter alia, the lessee's duty of diligent development, was intended to provide that CRI would receive payments under the multiple, or was intended solely to protect CRI from losses it would suffer if G & W's failure to diligently mine resulted in the termination of the leases. Id. at 450-51. The issue was specifically left for determination by the jury. Id.
 
 
 22
 The determination that G & W is not entitled to judgment as a matter of law by this court on the first appeal is now the "law of the case." "Issues decided at an early stage of litigation, either explicitly or by necessary inference from the disposition, constitute the law of the case." Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc., 761 F.2d 649, 657 (Fed.Cir.), cert. denied, 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985). See also Amen v. City of Dearborn, 718 F.2d 789 (6th Cir.1983), cert. denied, 465 U.S. 1101, 104 S.Ct. 1596, 80 L.Ed.2d 127 (1984); Petition of United States Steel Corp., 479 F.2d 489 (6th Cir.), cert. denied, 414 U.S. 859, 94 S.Ct. 71, 38 L.Ed.2d 110 (1973).
 
 
 23
 The [law of the case] doctrine precludes our reconsideration of the [previously decided issue] unless one of three "exceptional circumstances" exists: the evidence in a subsequent trial was substantially different; controlling authority has since made a contrary decision of law applicable to such issues; or the decision was clearly erroneous, and would work a substantial injustice.
 
 
 24
 Kori Corp., 761 F.2d at 657.
 
 
 25
 As the issue of whether G & W is entitled to judgment as a matter of law has previously been decided in this litigation, we need not address it further. Since none of the "exceptional circumstances" noted in Kori Corp. are present which would permit us to review the issue again, we decline to do so.
 
 B.
 Sufficiency of the Evidence
 
 26
 G & W argues that the verdict is contrary to the evidence in two respects. First, G & W argues that CRI failed to prove a violation of the Virginia leases. Whether the Virginia leases were violated, however, was not the issue before the jury. The issue was the intent of the parties with regard to the Assumption of Obligations provision.
 
 
 27
 Second, G & W asserts that the jury's answer to the special question that the Assumption clause was intended to insure payments to CRI under the multiple was contrary to the evidence. G & W points to just one statement elicited from CRI's president, Mr. Meadows, to support its claim. The witness stated:
 
 
 28
 That assumption agreement was mainly for my purposes in my mind to make sure that those leases were protected and they weren't lost. (Emphasis added.)
 
 He later stated:
 
 29
 I'm sure there were other reasons for it but that was my main purpose.
 
 
 30
 A review of all the testimony on this point, however, reveals that there was conflicting evidence as to the intent of the Assumption of Obligations Agreement. G & W's chief negotiator, Mr. Peake, testified that the assumption agreement was for the benefit of CRI under the multiple. "In reviewing civil jury verdicts to determine whether the evidence is sufficient to support the judgment, we follow the traditional rule of viewing the evidence in the light most favorable to the prevailing party." Calhoun v. Baylor, 646 F.2d 1158, 1160 (6th Cir.1981). Since there was testimony from which the jury could have found that the purpose of the Assumption of Obligations provision was to enable CRI to receive payments under the multiple, we are not free to upset that determination absent error requiring a new trial. That is particularly so since this court previously stated that such a determination was within the province of the fact finder.
 
 C.
 Fraud Issues
 
 31
 The trial court allowed CRI to introduce evidence of a mining plan developed by G & W prior to the purchase of CRI, and evidence of a loan request by G & W to the National Bank of Detroit (NBD) based on the pre-purchase mining plan. CRI had used this evidence at the first trial to support its fraud and oral contract claims against G & W. This court held, in the first appeal, that CRI could not pursue its fraud and oral contract claims because of the integration clause in the Acquisition Agreement. CRI introduced the same evidence at the second trial, this time as relevant to the issue of diligent mining and as relevant to the intent of the parties that the Assumption of Obligations promise was to insure payments under the multiple. G & W argues that the introduction of the evidence allowed CRI to retry its fraud and oral contract claims, even though the district court did not submit the fraud theory to the jury.
 
 
 32
 "Admission of relevant but potentially prejudicial evidence is also placed within the sound discretion of the trial court." Finch v. Monumental Life Ins. Co., 820 F.2d 1426, 1432 (6th Cir.1987). When ruling that the evidence of the pre-purchase mining plan and the loan request was admissible the trial court stated:
 
 
 33
 Unfortunately, evidence does not exist in watertight compartments. Evidence that bears upon evidence of the conduct of the parties may not only be evidence that would support a fraud claim; it may also be evidence that would support a lack of diligence claim. I'm simply unable to strain one out of the other.
 
 
 34
 I'm unwilling to deny the plaintiffs an opportunity to present that portion of the case that the Sixth Circuit said they could present. I'm willing to instruct the jury specifically that that is the only question and I will, if you wish, tell them that there is no fraud or misrepresentation involved. But I'm not going to grant a mistrial on the basis that it's possible to interpret some of the plaintiff's evidence as bearing upon fraud and misrepresentation.
 
 
 35
 It is my belief that it bears upon diligence in mining as well and that that is an issue which is before the court.
 
 
 36
 Although CRI was foreclosed from retrying its fraud and oral contract claims, it does not follow that evidence which related to those claims is not also relevant to issues remaining in the case. Evidence that G & W had a mining plan which it represented to CRI before the assumption agreement was signed is relevant to show that the parties intended the diligent mining terms of the underlying leases to be assumed by defendants and that the purpose of the clauses were to insure that G & W would diligently develop those properties so CRI would receive substantial payments under the multiple. However, evidence of what G & W later represented to National Bank of Detroit to secure a loan based on the sale of coal from these properties is not relevant to the parties' intent in agreeing to the assumption clause. If G & W denied that it had a plan, its representation to the bank might be relevant impeachment. However, that is not the case. The evidence regarding the bank loan was especially prejudicial, since after getting the loan on the basis of the leases in issue here together with other coal leases, G & W used the money for non-coal related business.
 
 
 37
 The District Court also admitted the evidence regarding G & W's proposed mining plan as evidence of what is required for diligent mining. Its admission for this purpose was error. In view of the integration clause and the disposition of the fraud claim on the prior appeal, defendant was not contractually bound to mine in accordance with its plan. It could only be required to mine diligently.
 
 
 38
 In view of the integration clause, what is required by the diligent mining terms of the leases will have to be determined based on an objective standard of what constitutes diligent mining in the coal mining industry. Plaintiff's expert witness testified that it does have a meaning and is measured by the amount of coal in the lease, the amount of capital needed to mine it, etc. The Virginia court in Home Creek Smokeless Coal Co. v. Combs, 204 Va. 561, 132 S.E.2d 399 (1963) provided suitable guidelines as to what a reasonable lessee would do to mine diligently. What G & W intended to do might be more than diligent mining required, might be what diligent mining required, or might be less than diligent mining. If G & W's intent has any probative value as to what diligent mining requires, that value is outweighed by the likelihood the jury would find that the parties agreed to that level of mining. This the jury may not do in view of the prior panel's holding regarding the integration clause. To the extent evidence is admissible regarding G & W's plan, the jury should be instructed that it may consider that evidence only to decide whether the purpose of the assumption agreement was to require diligent mining under the terms of the leases.
 
 D.
 Exclusion and Limitation of Witnesses
 
 39
 The trial court excluded the testimony of several of G & W's witnesses. Two of them, Mr. Safford and Mr. Shupe, were not permitted to testify because of G & W's failure to timely identify them as witnesses. Citing Fed.R.Civ.P. 26, the district court found that G & W's failure to identify the witnesses until two months before trial and nine years after the litigation began prejudiced CRI. Mr. Shupe represented the lessors of the property in the negotiation of the original leases. In view of the earlier panel's ruling that it is the intent of CRI and G & W regarding the assignment clause that is the issue, not the intent of CRI and the lessors at the time the leases were entered into, his testimony is irrelevant. Mr. Safford, however, was one of G & W's attorneys who drafted and negotiated the assignment agreement, and therefore a potentially critical witness on the intent issue.
 
 
 40
 Following remand from this court on May 20, 1985, G & W initially sent a letter, dated May 31, 1985, to the trial court requesting a conference so that deadlines could be set for additional discovery and the identification of new witnesses. On July 19, 1985, a conference was held and G & W made no mention of Mr. Safford or Mr. Shupe. The trial court, in later granting CRI's motion for protective order stated:
 
 
 41
 On July 19, 1985, the Court held a conference with the parties to discuss the posture of the case. The parties received permission to call new expert witnesses and take their depositions. No mention was made, however, of the need for additional fact witnesses or the discovery necessary for their proper presentation at trial. Now, with less than three weeks to the final pretrial conference and almost two months to trial, defendants are proposing new fact witnesses and noticing their depositions. To allow defendants to call new witnesses at this late date and force plaintiffs to take their depositions would be oppressive and unduly burdensome to plaintiffs.
 
 
 42
 Neither Shupe nor Safford had been listed on the witness list filed before the first trial. G & W had noticed Safford's deposition on August 16, 1985. He was listed on the pretrial statement filed in September of 1985. Plaintiff objected to Mr. Safford's deposition being taken because it would have to be taken in Italy where he lived and worked. His deposition there would require plaintiff's counsel to secure a passport. In addition, the trip to Italy would interfere with counsel's preparation for trial and entail expense. The witness was unwilling or unable to return to the United States. Since these problems will be unlikely to recur on retrial, we do not decide whether it was an abuse of discretion to refuse to permit the deposition or written interrogatories.
 
 
 43
 G & W also appeals the limitations the trial court placed upon the testimony of another witness, Mr. Sturgill. The trial court allowed Mr. Sturgill to testify as to factual matters but did not allow him to express his opinion whether the lessors thought that G & W had complied with the Virginia leases. As we stated in part II. A., the issue for trial was not whether G & W had complied with the diligent development requirements of the leases as they relate to the lessors but, rather, whether the Assumption of Obligations clause, which required, inter alia, that G & W assume the lessee's obligation to diligently develop the properties, was intended to benefit CRI in view of the multiple. Testimony as to whether the original lessors thought the diligence requirements were met is not relevant to that question, and therefore the exclusion of Mr. Sturgill's testimony in that regard was not error.
 
 
 44
 Finally, G & W argues that the trial court improperly limited each party to two expert witnesses, prejudicing G & W as it had no single, comprehensive expert witness of the kind presented by CRI. We recognize that "[it] is well within the discretion of a district court to limit the number of expert witnesses who testify at trial." Aetna Casualty & Sur. Co. v. Guynes, 713 F.2d 1187, 1193 (5th Cir.1983). However, limiting experts "because of mere numbers, without reference to the relevancy of their testimony" is an abuse of discretion. Padovani v. Bruchhausen, 293 F.2d 546, 550 (2d Cir.1961).
 
 
 45
 Where the trial court has articulated legitimate, rational reasons for its decision to limit expert witnesses, no abuse of discretion occurs. The Eighth Circuit has cautioned that, in applying the abuse of discretion standard, "we as an appellate court must be mindful that the district courts are closer to the facts and the parties, and that not everything that is important about a lawsuit comes through on the printed page." Kern v. TXO Prod. Corp., 738 F.2d 968, 970 (8th Cir.1984).
 
 
 46
 The trial court's explanation for limiting expert witnesses was as follows:
 
 
 47
 I'm going to limit each side to two expert witnesses. I don't see the questions here going much beyond that. If it develops during trial that this is unfair or that something has come up that requires expert testimony, I'll go into it at that time.
 
 
 48
 I can't imagine that at this point that there are any surprises left in this case. You know, for one thing, this case is already nine years old, and for another thing, it's been tried once extensively and I can't believe that anybody is going to be surprised by the testimony.
 
 
 49
 * * *
 
 
 50
 I'm going to limit you at this point and you can prepare accordingly and then if it develops that you are unable properly to present your case, I'll hear from you then, but I'm not going to do it in reverse. I'm simply saying at this point two expert witnesses per side. I will hear from you, in the event it appears that that's unfair or restrictive or whatever it might be.
 
 
 51
 The trial judge limited the number of experts due to his belief that two would be adequate for the evidence to be covered, and that because of the length of the time the case has gone on, no new issues would arise requiring additional experts. In addition, the trial court remained open to the possibility of revising its order if either party later demonstrated an inability "to properly present [its] case." We find no abuse in its initial position.
 
 
 52
 However, in view of the evidence presented by the plaintiff, it was unfair to deny defendant at least the expert witness Alan Stagg. Plaintiff presented two expert witnesses, Stonie Barker, a former executive with one of the country's largest coal mines, who testified as to how the leases should have been diligently mined and the costs of the mine plan he would recommend, and an accountant who used those figures to determine the profit which could be realized based on Barker's testimony. Barker based his plan on the coal reserves shown in a geological report prepared by Stagg for G & W, and was permitted to interpret that report. Defendant wished to call Stagg to dispute some of Barker's assumptions about the report but was not permitted to do so. The District Court limited Stagg's testimony to the identification of his report. Because plaintiff was using the Stagg report, it did not need an expert witness to establish the coal estimates. Defendant needed an expert to qualify and explain what the report meant when it talked of proven and probable coal seams. It also needed an expert to testify as to why the property was not profitably mineable, although the report indicated coal was there. Although Bobby Tuch, a mining engineer, was permitted to testify as to actual problems he had encountered while mining the property, he was not permitted to give his expert opinion as to why the property could not be mined profitably. The jury was instructed to disregard his testimony as to whether a seam of coal actually found on the property was economic or not economic to be mined. The two expert witnesses defendant was permitted were needed to counter Stonie Barker's plan: Gordon O'Dell, a consultant experienced in preparing computerized mining plans, and Dr. Robert Sansom on the economics of the coal industry.
 
 
 53
 It was unfair to permit plaintiff to prove the availability and quality of the coal in the leases by a report which had an aura of reliability because it had been prepared for defendant without permitting defendant to rebut that inference, particularly where the first of the two Stagg reports included land not within the leases assigned to G & W and where plaintiff's expert assumed mining conditions which did not actually exist.
 
 E.
 Expert Testimony
 
 54
 CRI presented expert testimony as to the damages it suffered because of G & W's failure to diligently develop and mine the leased properties. G & W argues that the testimony of CRI's expert should have been excluded for three reasons: (1) it was inadmissible speculation, (2) the award represents lost profits which are not recoverable under the circumstances of this case, and (3) the damages testimony was inconsistent with that presented at the first trial and was therefore inadmissible.
 
 
 55
 CRI's expert, Mr. Barker, had been employed in the coal industry for thirty-three years and was the chairman and chief executive officer of Island Creek Coal Company when he retired in 1984. At the time of his testimony, Mr. Barker was president of a consulting firm dealing with mining property and coal sales. Mr. Barker had held "the entire gamut of all jobs on a coal mining operation," and had mined the same type of coal that was the subject of the instant suit.
 
 
 56
 In preparation for trial, Mr. Barker developed what he determined to be a diligent mining plan for the leased properties during the period of June 1976 to June 1978 (the multiple period). He testified that he had developed such plans as part of his work for Island Creek Coal Company. Prior to developing the plan, Barker checked the coal prices for the period, geological reports concerning the leased properties, the contracts entered into between CRI and G & W, and other relevant documents. He testified that a diligent mining plan for the properties would include one strip mine, to be mined by G & W employees, and one auger mine and three underground mines, to be mined by contract miners. He further stated that G & W would have to spend substantial additional monies on equipment and plan development and construct a new coal washing facility. According to Barker, implementation of his diligent mining plan would have resulted in a first year coal production tonnage of 409,425 tons, with net earnings of $4,476,253.89. Second year tonnage, reduced because of a miners' strike, would have been 372,451 tons with earnings of $3,676,949.14. As a result of the two years of production under his diligent mining plan, CRI would have been entitled to $9,570,084 under the multiple.
 
 
 57
 Mr. Barker based his plan on geological reports prepared prior to the assignment of the leases. He assumed that coal from the Marker and Taggert marker strata which would account for most of the profits the first year of the two year multiple would be 80% metallurgical coal and 20% steam coal.[2] The testimony of Meadows, plaintiff's president who operated the mine for defendant the first six months of the two-year multiple, is that the coal was only 60% metallurgical and 40% steam. This difference in percentages was also material to sales of coal from other strata since under Barker's plan, marker seam coal would be mixed with other coal to upgrade the other coal to metallurgical quality.
 
 
 58
 Further, the prices G & W was to receive for its coal under Barker's plan assumed that G & W would immediately assemble a sales force of its own to sell coal directly to consumers or in the overseas market. There was no evidence that diligent mining required this exceptional sales effort. Although established coal companies may have sales forces, a great deal of coal is sold through brokers who, the testimony showed, receive 6 to 9% commission.
 
 
 59
 Most importantly, although Mr. Barker testified that his plan would provide diligent mining, he did not testify that diligent mining required the amount of mining provided in his plan. He did testify that diligent mining required deep mining of the Kelly seam which G & W failed to do. However, he acknowledged that although his plan provided for mining 400,000 tons of coal a year, 250,000 or 300,000 could also be considered diligent. Although it was plaintiff's contention, as stated in the court's instructions to the jury, that defendant "breached its contract obligation by ... failing to mine the Virginia leasehold in the most diligent, effectual ... manner," neither the assumption agreement nor the leases required the "most" diligent development of the leased premises.
 
 
 60
 Basically, what Barker said was that based on Stagg's report the coal is there;[3] it should take you so many hours and such and such equipment to get it out; that should cost you so much labor and depreciation of needed equipment. He did not take into account any down time or any unusual problems because of the size or width of the seams, delays in availability of freight cars, or any other of the problems which were actually encountered in mining the leases. He also assumed that G & W could sell all its coal at the price it received for some few small sales made directly to consumers. In fact, all its large sales were at substantially lower prices. He failed to base his testimony on the manner in which the leases were operated either before or after the acquisition but on some hypothetical situation. Indeed the coal washing facility he projected was designed to wash more tonnage than could be mined on the property leased to G & W. Thus his plan is subject to the same deficiencies which we found in the testimony of plaintiff's experts at the first trial.[4]
 
 1.
 Lost Profits
 
 61
 In furtherance of its claim that the evidence does not support the jury's award of damages, G & W argues that the jury improperly awarded damages for lost profits on a mining operation from which no profits were ever realized. G & W cites the rule, well-settled in Virginia, that lost profits are not recoverable for a new business which has not begun to operate when the breach of contract occurs, Mullen v. Brantley 213 Va. 765, 195 S.E.2d 696 (1973); see also Coastland Corp. v. Third Nat'l Mtg. Co., 611 F.2d 969 (4th Cir.1979), and asks that we extend the rule to businesses which, although started up and operational, are not operating at a profit. The argument is that determining lost profits for a business which is losing money is as speculative as determining lost profits for a business which has not yet begun to operate.
 
 
 62
 We think, however, that this case must be distinguished from cases where plaintiffs seek lost profits for damages to their own businesses whether not yet begun or begun and unprofitable. Here, CRI is not seeking profits it would have made from the operation of its own business. Rather, it is seeking payments under a multiple based on the operation of G & W's business. Moreover, mining operations on the leased properties were not always carried on at a loss. CRI profitably mined the properties for a short period.
 
 
 63
 In all events, whether G & W's mining operations operated at a loss is not controlling. Why it operated at a loss--whether it diligently developed and mined the properties--is one of the central issues in this case. It would be illogical indeed to allow G & W to interpose the fact that it lost money on the mining operations as a defense against CRI's recovery, when the issue is whether G & W lost money because it breached its contractual obligation to mine in a diligent manner. Evidence as to its losses and the reasons for the same was relevant as to whether the property could be mined profitably when mined diligently.
 
 
 64
 Although the expert testimony as to damages was, as we have held, too speculative to be admissible upon retrial, a mining plan may be used to calculate damages if based on accepted mining principles as to what is required by diligent mining and the known properties of leases. Thus, the dangers of speculating about lost profits as to businesses not yet established are not present in this case.
 
 2.
 Judicial Estoppel
 
 65
 Mr. Barker testified that the selling price of metallurgical coal, during the period in question, was between $42 and $44 a ton. G & W objected at trial, and objects now, to that testimony, because at the first trial CRI's counsel stated in his opening statement, and again in closing argument, that the market price for the coal during the same period was between $32 and $38 a ton, and therefore CRI is judicially estopped from now claiming differently. Additionally, G & W argues that CRI should have been judicially estopped from presenting its evidence as to total damages suffered by G & W's failure to diligently develop and mine the properties, because the evidence on damages offered at the second trial was in an amount nearly twice that offered at the first trial.
 
 
 66
 The doctrine of judicial estoppel applies to a party who has successfully and unequivocally asserted a position in a prior proceeding; he is estopped from asserting an inconsistent position in a subsequent proceeding.
 
 
 67
 Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 598 (6th Cir.1982).
 
 
 68
 This doctrine applies, however, only when the party successfully asserts a position. Id. at 599.
 
 
 69
 The requirement that the position be successfully asserted means that the party must have been successful in getting the first court to accept the position. Absent judicial acceptance of the inconsistent position, application of the rule is unwarranted because no risk of inconsistent results exists. Thus, the integrity of the judicial process is unaffected; the perception that either the first or the second court was misled is not present.
 
 
 70
 Id. (Footnote omitted). We reject G & W's judicial estoppel argument because CRI was not successful in the prior trial. Its verdict was reversed on appeal.
 
 
 71
 Even if Mr. Barker's testimony is admitted, G & W argues, it should be allowed to introduce the prior statements made by CRI's counsel in the first trial.
 
 
 72
 The statements made by CRI's counsel in the first trial concerning coal prices between $32 and $38 a ton related to coal of certain quality and sold in a different manner than Mr. Barker's proposal. Thus, they do not impeach Barker.
 
 
 73
 G & W argues, in the alternative, that G & W should have been allowed to introduce the prior statements of CRI's counsel as admissions and substantive evidence of the price of coal. The trial court excluded the evidence as prejudicial.
 
 
 74
 Although relevant, evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice...." Fed.R.Evid. 403. The decision to exclude evidence pursuant to Rule 403 is within the sound discretion of the trial court. United States v. Runnels, 833 F.2d 1183, 1193 (6th Cir.1987). As the plaintiff's counsel's statement concerning the price of coal in the first trial was made in the context of that trial which included a theory of recovery this court foreclosed from consideration at the second trial, and because the difference in prices is attributable to differences in processing methods, admitting the statements with the necessary explanations could result in unfair prejudice and confusion. The trial court did not abuse its discretion in excluding the prior statements.
 
 F.
 Jury Instructions
 
 75
 G & W argues that the trial court erred, first, by presenting two special questions to the jury and, second, by refusing to give a jury instruction regarding speculation by an expert witness.
 
 1.
 
 76
 The trial court asked the jury to answer the following two questions:
 
 
 77
 Question number one, "Was the purpose of the assumption of obligations clause to insure that defendant, Gulf & Western Industries, Inc., would diligently develop the Virginia properties in order that plaintiff, Coal Resources, Inc., would receive substantial payments under the multiple?"
 
 
 78
 * * *
 
 
 79
 Question two, "Was the assumption of obligations clause breached in that Gulf & Western Industries, Inc. did not diligently develop the Virginia properties?"
 
 
 80
 G & W contends that the trial court's instructions relevant to those questions ignored the obligations to the lessors imposed by the leases and implied that the Assumption of Obligations clause creates a per se duty to diligently develop and mine. We think, however, that G & W's misunderstanding of the relevance of the diligent mining language in the leases is at the root of its claim that the trial court misinstructed the jury on the matter. The error in G & W's contention is its assumption that the duty to diligently mine is a duty owed only to the lessors and was satisfied by the minimum royalties payments. The leases, however, do not define diligent development and mining. And we have earlier, in this opinion, explained that the payment of minimum royalties did not, as a matter of law, satisfy the duty to diligently mine the Virginia property. See part II, A. As this court explained in its earlier opinion, it is a question of fact for the jury whether the duty to diligently mine under the leases, as incorporated into the Assumption of Obligations clause, was for the purpose of generating substantial payments to CRI under "the multiple." Coal Resources, Inc., 756 F.2d at 451. Evidence was presented at trial, pro and con, as to whether that was the purpose of the assumption clause. The trial court then instructed the jury on the matter, in practically the identical language this court used in defining the issue in its earlier opinion. This court stated:
 
 
 81
 If the finder of fact determines that the assumption of obligations clause was breached in that Gulf & Western did not diligently develop the Virginia leaseholds, and if the finder of fact further decides that the purpose of the clause was to insure that Gulf & Western would diligently develop those properties so that Coal Resources would receive substantial payments under the multiple, then an award for a breach of contract like the one under review here would be permissible.
 
 
 82
 Coal Resources, Inc., 756 F.2d at 451.
 
 
 83
 The trial court's instructions to the jury on the matter track the foregoing language faithfully. Likewise, the two special questions required the jurors to decide precisely the two issues this court required be submitted to the fact finder: whether the Assumption of Obligations clause was breached, and whether the purpose of the clause was to insure that a diligent mining of the property would generate for CRI "substantial payments under the multiple." The trial court's jury instructions and the special questions it framed for jury response to which G & W objects could not have been more faithful to this court's holding in its earlier opinion and its directions to the trial court.
 
 2.
 
 84
 G & W also maintains that the trial court erred in failing to give a jury instruction regarding speculative testimony by an expert witness. Although the trial court refused to give G & W's proposed instruction, it did caution the jury as to speculation on the part of the expert. Prior to the testimony of CRI's expert, the court explained to the jury:
 
 
 85
 [An expert witness] may take into consideration facts that have been established, and render an opinion upon those facts.
 
 
 86
 Now, observe, an expert witness need not be believed by you just because he's an expert. You must decide how much weight, credibility you will give to that expert's opinion. You may decide that the expert doesn't have sufficient background or education to render an opinion. You may decide that the opinion as given isn't based upon the facts that you believe have been established in this case.
 
 
 87
 No matter what the qualifications of an expert witness may be, he is a witness as any other witness and you are the sole judge of how much weight, credibility if any, that you will give to that expert's opinion.
 
 
 88
 In addition, in instructing the jury on damages, the trial court cautioned, "Damages cannot be based upon speculation or mere possibility." We think the trial court covered the subject adequately. There was no error in its refusal to give G & W's version of the same instruction.
 
 G.
 Interest
 
 89
 Finally, two issues concerning pre-judgment interest must be resolved. First, G & W appeals the trial court's award of the actual interest rather than interest at the statutory rate on the $500,000 payment to which G & W confessed judgment, and which CRI alleges was to be paid to Central Trust Bank on a note. Second, CRI cross-appeals the trial court's denial of pre-judgment interest on the jury award for breach of contract.
 
 1.
 
 90
 Prior to the second trial, G & W confessed judgment on CRI's breach of contract claim as to a $500,000 payment which was to be made upon a promissory note one year after the sale of CRI's assets. G & W's counsel stipulated prior to trial that G & W knew the payment was for an interest bearing note, and that the interest rate was two percent above the prime rate. The trial court held that G & W was liable to CRI for the $500,000 plus the actual interest rate of the note. In an opinion in response to G & W's motion for a new trial or judgment notwithstanding the verdict, the trial court stated:
 
 
 91
 Upon consideration, this Court finds that defendants' offer of judgment on this claim included all damages to which plaintiffs were entitled and that the actual interest incurred on the obligation must be included in those damages. The Ohio statute is designed to compensate plaintiffs for the loss of use of their money, not to limit their recovery where damages resulting from the defendants' conduct take the form of interest.
 
 
 92
 Coal Resources, Inc. v. Gulf & Western Indus., Inc., 645 F.Supp. 1028, 1037 (S.D. Ohio 1986).
 
 
 93
 The Ohio statute referred to by the trial court states in pertinent part:
 
 
 94
 (A) In cases other than those provided for in sections 1343.01 and 1343.02 of the Revised Code, when money becomes due and payable upon any bond, bill, note, or other instrument of writing, upon any book account, upon any settlement between parties, upon all verbal contracts entered into, and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest at the rate of ten percent per annum, and no more, unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract.
 
 
 95
 Ohio Rev.Code Sec. 1343.03. The trial court's statement, Coal Resources, Inc., 645 F.Supp. at 1037, reflects the court's understanding that it was not awarding pre-judgment interest per se, but was awarding CRI its total damages due to G & W's failure to make the $500,000 payment upon an interest bearing note.
 
 
 96
 The acquisition agreement, however, makes no mention of the note held by Central Trust Bank. Rather, the agreement simply requires payment of $500,000 to be made June 11, 1977, and it is silent as to interest. Therefore, G & W's contractual obligation is not upon a written contract which "provides a different rate of interest in relation to the money" than the statutory interest under Sec. 1343.03.
 
 
 97
 For entitlement to a rate different than the statutory rate of interest to be charged, R.C. 1343.03(A) sets forth two prerequisites: (1) there must be a written contract between the parties; and (2) that contract must provide a rate of interest with respect to money that becomes due and payable.
 
 
 98
 Hobart Bros. Co. v. Welding Supply Serv. Inc., 21 Ohio App.3d 142, 144, 486 N.E.2d 1229 (1985). Since the acquisition agreement makes no mention of an interest rate to be paid on the $500,000 payment, the trial court erred in awarding CRI interest at the rate of interest on the note with Central Trust Bank. Interest should have been awarded at the Ohio statutory rate of interest.
 
 2.
 
 99
 CRI cross-appeals the trial court's denial of pre-judgment interest on the jury award for breach of contract. The trial court stated:
 
 
 100
 It is settled law in Ohio that statutory prejudgment interest will not be awarded on sums that remain unliquidated until the date of judgment, Braverman v. Spriggs, 68 Ohio App.2d 58, 426 N.E.2d 526 (1980), unless the sums are readily ascertainable by certain calculations based upon existing market values. Royal Crown Plastics sales, Inc. v. Motorists Mutual Ins. Co., 51 Ohio App.2d 79, 366 N.E.2d 294 (1976); accord Roth Steel Products v. Sharon Steel Corp., 705 F.2d 134, 140 n. 9 (6th Cir.1983); Bituminous Casualty Corp. v. Lynn, 503 F.2d 636 (6th Cir.1974). Accordingly, no award would be possible in this case under the Ohio prejudgment interest statute as it has been interpreted by the Ohio courts.
 
 
 101
 Coal Resources, Inc., 645 F.Supp. at 1037.
 
 
 102
 Following the first trial, the trial court awarded pre-judgment interest to CRI on its breach of contract claim. On appeal, this court stated that the breach of contract claim involved unliquidated damages which precluded prejudgment interest under Ohio law. Coal Resources, Inc., 756 F.2d at 451. The holding that pre-judgment interest is not recoverable is now the law of the case. Kori Corp., 761 F.2d at 657. Nevertheless, CRI asked the trial court to exercise its equitable powers and award pre-judgment interest. The trial court, while recognizing its power to award prejudgment interest when necessary to make the plaintiff whole, or to disgorge defendant of undeserved gain, declined to exercise that power. The trial court found that defendant made no gains because of its breach of contract. Further, the trial court stated it was the province of the jury to make the plaintiff whole in this case, and it was unwilling to tamper with the jury's determination. We agree with the trial court and find no abuse of discretion in its denial of pre-judgment interest on the jury verdict.
 
 III.
 
 103
 Accordingly, the district court's award of pre-judgment interest on the confession of judgment is REVERSED and REMANDED to the trial court with an order to award pre-judgment interest, as to the confession of judgment only, according to Sec. 1343.03 of the Ohio Revised Code. The judgment of the district court on the contract claim is also REVERSED and REMANDED for new trial.
 
 
 104
 RYAN, Circuit Judge, dissenting.
 
 
 105
 This court has now, for the second time, set aside a multi-million dollar verdict for the plaintiff and has ordered the case to be tried for a third time. It does so, in my judgment, on a remarkably insubstantial basis and one utterly unsupported by the law or the facts of the case.
 
 
 106
 The principal reason assigned for invalidating the jury's verdict is that the testimony of the plaintiff's expert witness as to the requirements for diligent mining was "too speculative to be admissible." I respectfully disagree.
 
 
 107
 The majority opinion holds that the trial judge erred in receiving, over the defendant's objection, the expert opinion testimony of plaintiff's witness, Mr. Barker. A careful reading of the court's opinion reveals that it actually challenges Mr. Barker's opinion on two grounds: 1) that many of the witness's assumptions such as the quality of the coal involved, potential available sales prices, possible production problems, and the capacity of a certain coal washing facility, are incorrect, and 2) that the witness's opinion does not establish the proper measure of damages that should result from a diligent mining plan because "he acknowledged that although his plan provided for mining 400,000 tons of coal a year, 250,000 or 300,000 could also be considered diligent." P. 771.
 
 
 108
 The short answer to the two contentions made in the majority opinion is that the first is no more than a disagreement with the data base upon which the acknowledged expert rested his opinion and is a matter exclusively within the province of the jury, and the second is simply a mistaken understanding of the evidence.
 
 
 109
 The majority acknowledges that Mr. Barker was qualified as an expert to render an opinion about the matter for which he was called to testify--his opinion, as an experienced coal producer, as to what a plan for the diligent mining of the property required. He gave that opinion and, in doing so, testified at length about the data upon which his opinion rested. He emphasized that his opinion of what diligent mining of the property required was not measured entirely by the amount of coal that would be produced for a given period of mining. Many other factors, he said, comprised his opinion of what diligent mining of the property required. The majority opinion takes issue, however, with the sufficiency of the factual basis for Mr. Barker's opinion, disagrees with the significance of the factors he relied upon, points to considerations my colleagues think important that Mr. Barker did not, argues that the diligent mining plan described by the witness is deficient, and concludes therefrom that the witness's testimony is inadmissible mere speculation.
 
 Federal Rule of Evidence 703 provides:
 
 110
 The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
 
 
 111
 In explicating its understanding of Rule 703, this court has stated:
 
 
 112
 The purpose of Rule 703 is to make available to the expert all of the kinds of things that an expert would normally rely upon in forming an opinion, without requiring that these be admissible in evidence. Under the Rule, the expert is free to give his opinion relying upon the types of data an expert would normally use in forming an opinion in his area of expertise.
 
 
 113
 Mannino v. International Mfg. Co., 650 F.2d 846, 851 (6th Cir.1981).
 
 
 114
 Although defendant G & W argues, and my colleagues agree, that the plaintiff's expert testimony is speculative, neither suggest that Mr. Barker was not relying on data of a type reasonably relied upon by experts in his field. The court holds that Mr. Barker's opinion should not have been considered by the jury because the opinion did not take into account factors the court regards as critical to a valid diligent mining opinion. For example, the majority holds that the coal prices used by Mr. Barker in his diligent mining plan were purely speculative. The expert testified, however, that he verified the selling price by checking pricing schedules used by other coal companies which were in effect at the time the plan was to be effective. My colleagues do not argue that an expert in the field may not reasonably rely on such data. They hold instead that the defendant did not sell the coal for the price Mr. Barker claimed it could be sold for, and that Mr. Barker did not "take into account any down time or any unusual problems because of the size or width of the seams, delay in availability of freight cars, or any other of the actual problems that were actually encountered in mining the leases." I am unable to see how Mr. Barker's disagreement with the witness Meadows that the coal was sixty percent metallurgical and forty percent steam, his failure to testify that sometimes coal is sold through brokers who receive six to nine percent commissions, and his assumptions that the coal could be sold at prices with which the defendant disagreed, renders his opinion inadmissible. The court also objects to Mr. Barker's determinations about the coal market, mining costs, contracting costs, and the quality and quantity of the coal contained in the lease properties. But all of these factors were components of his diligent mining plan and comprised the data base upon which his opinion rested. The witness testified that he verified all the figures used as a basis for making his determinations, and that his plan was developed in accordance with generally accepted mining principles. The court's opinion that the data the expert relied upon in forming his expert opinion was inadequate, irrelevant or incomplete, may raise questions about the adequacy and reliability of the data, but those are matters that relate to the credibility of the opinion, not its admissibility. Without an evidentiary showing that Mr. Barker relied on data which would not be reasonably relied upon by experts in the field in forming the opinion Mr. Barker was asked to render, there is no basis for an appellate holding that, as a matter of law, the witness's opinion testimony is inadmissible as mere speculation.
 
 
 115
 The second part of the majority's rationale for reversal, although not specifically labeled as such, is that Mr. Barker's testimony did not establish the correct measure of damages in that, although he presented a diligent mining plan--albeit it one with which my colleagues disagree--he did not testify as to the minimum amount of coal production that would be required to constitute diligent mining. Specifically, the court states:
 
 
 116
 Most importantly, although Mr. Barker testified that his plan would provide diligent mining, he did not testify that diligent mining required the amount of mining provided in his plan. He did testify that diligent mining required deep mining of the Kelly seam which G & W failed to do. However, he acknowledged that although his plan provided for mining 400,000 tons of coal a year, 250,000 or 300,000 could also be considered diligent. (Emphasis added.)
 
 
 117
 P. 771.
 
 
 118
 In the first place, the burden was upon the plaintiff to establish what a diligent mining plan would require. The expert did not say that diligence was determined by the amount of coal produced, but rather by the method of development over the life of the mine. Indeed, he stated that his idea of diligent mining did not depend upon the amount of coal that was produced. Specifically, he testified:
 
 
 119
 Let me explain what I think a diligent mining plan on this property or any property would be. That's why I would not agree to any given tonnage for, whether it be 250,000 tons or 300,000.
 
 
 120
 In developing a plan, I used the reserves that were on the leases and planned to recover those or have an operation that would at least have an 18--say a 15 to 20 year life. And I developed a plan that I thought was reasonable and under that plan, in a normal year, you would have about 500,000 tons. Depending on what interferences you might have with mining, whether you lost two or three months because of a strike, whether you had other losses because of weather or what have you, it would reduce that plan. Of course, that could be a diligent mining plan.
 
 
 121
 For me to just say that a 150 or 250 would be a diligent mining plan, I don't think you can do that with this property. (Emphasis added.)
 
 
 122
 Mr. Barker also testified that a diligent mining plan required not only strip mining, but underground and auger mining as well. It is clear from his testimony that, in his opinion, the diligence of a mining effort is determined by the method used to develop the mining operations and not the minimum amount of coal produced.
 
 
 123
 G & W offered no testimony from its experts that diligence was determined by the amount of coal mined in any one year. In fact, one of G & W's experts, Mr. O'Dell, testified that a plan of development is dependent upon the types of mining applicable to the land and the life of the mine. Such testimony is very similar to Mr. Barker's testimony in this regard. It is true that G & W's expert calculated that a lesser amount of coal would be produced under the mining plan developed by Mr. Barker. But he explained that his calculation of the amounts of coal produced by strip and auger mining were based upon the amount of coal actually mined by G & W. Such data is relevant to what G & W in fact did, but not to what it should have done under the Assumption of Obligations provision.
 
 
 124
 In the second place, Mr. Barker did not say, as the court claims, that "although his plan provided for mining 400,000 tons of coal a year, 250,000 or 300,000 could also be diligent." What he did say, part of which is quoted above, is:
 
 
 125
 Let me explain what I think a diligent mining plan on this property or any property would be. That's why I would not agree to any given tonnage for, whether it be 250,000 tons or 300....
 
 
 126
 ....
 
 
 127
 For me to just say that 150 or 250 would be a diligent mining plan, I don't think you could do that with this property.
 
 
 128
 As far as I'm concerned, with the assets that we had to work with, the leases, that is, I felt that a reasonable mining plan should mine, under normal conditions, say 450 to 500,000 tons a year.
 
 
 129
 To say that tonnage produced less than that was not a diligent plan, being specific about it, under the first and second year of my plan, I've accounted for the days in it and the reasons why the plan fell short. Now, I could not or wouldn't feel comfortable in testifying that somebody else could develop a plan that would be maybe similar to mine but maybe not exactly like it.
 
 
 130
 It's very difficult for me to sit here and say that a 200,000 ton production or say whatever, would not be a diligent mining plan or would be diligent. I hope I'm not confusing you. (Emphasis added.)
 
 
 131
 That testimony is a long way from a statement that "250,000 or 300,000 could also be diligent."
 
 
 132
 Of course, no evidence was offered by anyone to the effect that mining production of 250,000 or 300,000 tons, or some lesser amount would be diligent mining. It is, at best, a strange contention that Mr. Barker's opinion as to the requirements of a diligent mining plan was inadmissible speculation because it did not affirmatively reject a possible hypothetical opinion that a different mining plan resulting in smaller coal production would nevertheless be diligent, if indeed such an opinion were offered. It was the plaintiff's burden to offer evidence to prove its case. It had no duty to offer evidence to impeach or contradict it.
 
 
 133
 In summary, once Mr. Barker was shown to be qualified under Fed.R.Evid. 702 to testify as an expert, he was entitled to give any opinion he had, whether or not it took into account all the relevant data a different expert, or this court, might like to have seen the witness evaluate, providing his opinion was based on data reasonably relied upon by experts in the coal mining business. Moreover, such data need not be in evidence or admissible in evidence. Fed.R.Evid. 702.
 
 
 134
 Credibility determinations are for the finder of the fact and not for us. One of the functions of the fact finder in considering expert opinion testimony is to decide whether an expert's opinion rests on facts or data adequate to support the opinion, and whether the facts or data are themselves persuasive. Those are matters that affect the credibility of the expert's evidence, not its admissibility. See, e.g., Wrenn v. Gould, 808 F.2d 493, 499 (6th Cir.1987).
 
 
 135
 I would affirm the verdict and judgment below.
 
 
 
 *
 The Order amending this opinion is published at 877 F.2d 5
 
 
 [1]
 The plaintiff-appellant companies are identified collectively as Coal Resources, Inc. in the parties' briefs, in the rulings of the lower court, and in the prior decision of this Court, and will be referred to by that designation in this opinion. Similarly, Virginia Met Coal Company, Jersey Kentucky Coal Company and New Jersey Zinc Coal Company are wholly-owned subsidiaries of Gulf & Western Industries. In the parties' briefs, the rulings of the lower court, and in the prior decision of this Court they have been treated as an entity and referred to as Gulf & Western. We will do the same
 
 
 [2]
 Mr. Barker did not "disagree" that the coal was 60% metallurgical and 40% steam. He was presenting a plan for mining the lease which was based on the report estimates of the Stagg report. Profits, however, could only be realized on the coal actually found on the leases
 
 
 [3]
 Without Stagg's testimony as to what his report purports to show, it was not possible for the jury to weigh the validity of the underlying assumption on which Barker based his plan
 
 
 [4]
 Although the original opinion on the prior appeal was vacated by rehearing, the opinion on rehearing reaffirmed the holding that the testimony of plaintiff's experts concerning damages for fraud was inadmissible speculation. The original opinion stated:
 At the very least, the plaintiff must provide "a sufficient basis for the jury's computation of the damage...." Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 266, 66 S.Ct. 574, 580, 90 L.Ed. 652, 661 (1946). A "sufficient basis" requires "data from which the amount of the probable loss could be ascertained as a matter of reasonable inference." Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684, 691 (1927); see generally J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d (1981). A plaintiff may not indulge in theories that result in proof that is speculative, remote and uncertain, but "must furnish some approximation of the actual damages so that they may be determined with reasonable certainty." Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383, 392 (6th Cir.1962. In short, a jury must not be required to resort to speculation in order to arrive at a damage figure. See Emich Motors Corp. v. General Motors Corp., 181 F.2d 70 (7th Cir.1950).
 Although F.R.E. 703 has greatly liberalized the law regarding the type of information on which an expert may base his opinion, compare Melton v. O.F. Shearer & Sons, Inc., 436 F.2d 22, 28 (6th Cir.1970) with Mannino v. International Manufacturing Corp., 650 F.2d 846, 851 (6th Cir.1981), that liberalization has not eliminated the requirement that an expert ground his opinion on reliable data rather than pure speculation. See Murphy Tugboat Co. v. Crowley, 658 F.2d 1256, 1262-63 (9th Cir.1981); United States v. 91.9 Acres of Land, Etc., 586 F.2d 79, 88 (8th Cir.1978), cert. denied, 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979); Mills v. United States, 363 F.2d 78 (8th Cir.1966); Syracuse Broadcasting Corp. v. Newhouse, 319 F.2d 683, 688 (2d Cir.1963); American Bearing Co. v. Litton Industries, Inc., 540 F.Supp. 1163 (E.D.Pa.1982). An examination of Ziegler's [sic] testimony reveals that it is based on numerous assumptions which are neither supported by evidence in the record nor proven to be the type of information on which experts in his field regularly rely.
 Coal Resources, Inc. v. Gulf & Western Indus., Inc., Nos. 82-3443, 3444, 3445, 3446, orig. op. (6th Cir. June 8, 1984) [738 F.2d 438 table].