**W.N. POUNDSTONE, D.C. Hall Jr., E.R. Phelps, Dennis Hall, Plaintiffs–Appellants, Cross–Appellees,**

v.

**DEW RESOURCES, INC., Defendant,**

**Pyramid Mining, Inc., Defendant–Appellee,**

**Patriot Coal Company, Ltd., Defendant–Appellee, Cross–Appellant.**

Nos. 01–6245, 01–6278.

United States Court of Appeals, Sixth Circuit.

Sept. 3, 2003.

John C. Whitfield, Whitfield & Calvert, Madisonville, KY, George E. Stigger, St. Marys, GA, for Plaintiffs–Appellants/Cross–Appellees.

Steven S. Crone, Owensboro, KY, for Defendant–Appellee.

Winfrey P. Blackburn, Jr., David Domene, Blackburn, Hundley & Domene, Louisville, KY, for Defendant–Appellee/Cross-Appellant.

BEFORE: KEITH, COLE, and COOK, Circuit Judges.

## OPINION

COLE, Circuit Judge.

Appellants/Cross–Appellees W.N. Poundstone, D.C. Hall, Jr., E.R. Phelps, and Dennis Hall (collectively "Appellants") appeal the district court's decision granting in part and denying in part their partial motion for summary judgment for breach of contract and tort claims against Appellee/Cross–Appellant Patriot Coal Company, Ltd. ("Patriot"). Patriot cross-appeals the district court's decision and the awarding of damages to Appellants. The United States District Court for the Western District of Kentucky granted in part and denied in part Appellants' partial motion for summary judgment and Patriot's cross-motion for summary judgment. Appellants raise eight issues on appeal relating to the district court's denial in part of their motion for partial summary judgment of their various contract and tort claims relating to royalty payments owed to them by Patriot under two contracts. Patriot cross-appeals the district court's decision arguing that the district erred in awarding damages to the Appellants, denying its motion for summary judgment on the issue of overpayment to Appellants, and denying its motion for summary judgment based on the defenses of estoppel, laches and waiver.

For the reasons stated herein we **AFFIRM** in part and **REVERSE** and **REMAND** in part the judgment of the district court.

## I. BACKGROUND

### A. Factual Background

In 1984, Appellants formed DEW Resources, Inc. ("DEW"). On September 28,

1984, DEW and Reynolds Metals Company ("Reynolds") entered into a coal mining lease (the "Reynolds Lease"). The Reynolds Lease gave DEW the right to mine certain lands located in Henderson County, Kentucky. It also gave DEW the right of first refusal to mine coal from other lands owned by Reynolds.

On November 27, 1985, DEW subleased the Reynolds Lease to Pyramid Mining Company ("Pyramid"). The sublease gave Pyramid the right to mine the lands in Area I of Reynolds' land and required Pyramid to pay royalties to both Reynolds and DEW for all the coal mined. On April 28, 1988, Appellants and Pyramid executed a Letter Agreement in which Appellants agreed to sell all of the issued and outstanding shares of stock in DEW to Pyramid for $1.2 million in cash. On May 13, 1988, in conjunction with the sale of the stock, Appellants and Pyramid entered into two separate agreements which provided for additional payments to Appellants based on the occurrence of certain events. These agreements were entitled the Contingent Benefit Agreement ("CBA") and the Contingent Interest Agreement ("CIA").

On October 25, 1986, subsequent to entering the Reynolds Lease, Reynolds entered into a coal mining lease with Green Construction of Indiana, Inc. (the "Green Lease"). The Green Lease related to property owned by Reynolds and contiguous to Area I, referred to as Area III. DEW contested Reynold's right to enter the Green Lease, contending that Section 2.4 of the Reynolds Lease gave it the right

of first refusal to mine Area III.[1] DEW sued Reynolds to enforce Section 2.4 of the Reynolds Lease. The dispute was settled on October 31, 1988 and the terms of the settlement included that the Green Lease became effective, Section 2.4 of the Reynolds Lease was deleted, the production royalty rates in the Reynolds Lease were reduced, and DEW was granted the right to select from an additional area owned by Reynolds, referred to as Area IVB, from which to mine.

Pyramid mined the lands in Area I according to its sublease and prepared monthly statements for Appellants. On May 26, 1989, Appellants brought suit against Pyramid concerning the calculations of payments being made to them under the CBA and the CIA. The suit was settled on June 22, 1990, the CBA and the CIA were amended to reflect a new method for calculating payments, and the parties executed a release of claims.

On April 14, 1994, Pyramid assigned the Reynolds Lease to Patriot (the "Lease Assignment"). The CBA and the CIA likewise were assigned to Patriot on April 14, 1994. Pyramid also assigned an agreement known as the Allen Lease to Patriot. The Allen Lease covered land contained in Area I not owned by Reynolds. The Reynolds Lease was amended four times and as a result of Amendment No. 4, executed in March 1995, Patriot acquired the right to mine lands known as Area IVA. As a result of these assignments and amendments, Patriot mined and sold coal from Area I, Area IVB, Area IVA, and the

---

1. Section 2.4 of the Reynolds Lease states in pertinent part:

   Lessor owns other minable coal lands in Henderson County, Kentucky which are not included in this Lease. So long as this Lease is in effect and Lessee is not in default ... Lessee shall have the right to lease the coal rights and to obtain an exclusive license to

   enter on any such properties.... Lessor shall, prior to leasing or selling any other property in Henderson County, Kentucky, which contains coal minable by surface methods, to a third party, give Lessee thirty (30) days' notice of Lessor's intent to lease or sell such property.

Allen Lease. Patriot provides Appellants with a monthly report calculating payments due under the CBA and the CIA and with royalty checks based on those reports.

### B. Procedural Background

On September 16, 1997, Appellants brought the present action against DEW and Pyramid alleging breach of contract and negligence for miscalculation of royalty payments due under the CBA and the CIA. On February 24, 1999, Appellants filed a First Amended Complaint, adding Patriot as a defendant. On March 16, 2000, Appellants filed a motion for partial summary judgment. After discovery, Appellants filed a supplemental motion for partial summary judgment on two additional issues on May 17, 2000. On June 16, 2000, Appellants filed a Second Amended Complaint and Restated Complaint, adding claims for conversion, fraud, breach of contract/constructive receipt, and negligence. On June 19, 2000, Patriot filed a counterclaim arguing that it overpaid Appellants and a cross-motion for summary judgment. On January 17, 2001, the district court issued a Memorandum Opinion and Order, granting in part and denying in part Appellants' motion for partial summary judgment, and granting in part and denying in part Patriot's cross-motion for summary judgment. On September 5, 2001, the district court entered a judgment awarding Appellants the sum of $152,297.59. Appellants filed a timely Notice of Appeal on October 2, 2001 and Patriot filed a timely Notice of Appeal on October 12, 2001.

## II. ANALYSIS

### A. Standard of Review

We review *de novo* an appeal of a district court's grant of summary judgment. *Ewolski v. City of Brunswick*, 287 F.3d 492, 500 (6th Cir.2002). Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Summary judgment is appropriate if a party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party must set forth specific facts showing that there is a genuine issue for trial. A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Deductions for Severance and Related Taxes [2]

■ Appellants argue that the district court erred in finding that Patriot proper-

---

**2.** It should be noted that all the issues presented by the parties in this suit relate broadly to breach of contract under the CBA and the CIA. Though the CBA and the CIA do not have forum selection clauses, they relate to land located in Kentucky. All other agree-

ments relating to this action, including the Reynolds Lease and the Letter Agreement, provide that the contracts are governed by the laws of the Commonwealth of Kentucky. Additionally, neither party has ever disputed the application of Kentucky law to resolution of

ly deducted severance and related taxes from the average sales price in calculating the contingent interest payments due Appellants. They argue that paragraph five of the CIA defining "Gross Realization" was superseded by paragraph four of Amendment No. 4 to the Reynolds Lease. Patriot argues that the clause in the CIA stating that Gross Realization would be construed consistent with any changes to the term by parties of the Reynolds Lease is simply a "gap filler." Patriot argues that this "gap filler" is a default standard that is relevant in addressing unanticipated variables affecting Gross Realization that are not specifically accounted for in the CIA, CBA, or other Amendments. Patriot argues that the "gap filler" is not activated by the Amendment to the Reynolds Lease because the CBA and the CIA specifically provide that severance and related taxes will be deducted from the payments.

Paragraph five of the CIA defines "Gross Realization" in relevant part as:

> The term "Gross Realization" as used herein shall mean the total sum of money received for coal sold to consumers from Area I during any month calculated as follows ... excluding all severance taxes, sales taxes.... This definition of Gross Realization shall be interpreted and construed in a manner consistent with the interpretation and construction of the definition of Gross Realization as may be agreed to from time to time by the parties to the Reynolds lease.

Section 3.2(c) of the Reynolds Lease, signed in 1984, originally read:

(c) *Determination of Gross Realization.* ... [T]he term Gross Realization as used herein shall be the product of the number of tons of such coal sold by Lessee times the sales price per ton (2,000 pounds) of that product ... undiminished by sales costs, expenses or commissions, but excluding all severance taxes, sales taxes, reclamation fees.... [3]

However, in 1995, the parties executed an Amendment to the Reynolds Lease. Paragraph four of that Amendment states:

Section 3.2(c) of the Lease is hereby amended to read as follows:

(c) *Definition of Sales Price.* The term Sales Prices as used herein shall be the product of the number of tons of such coal sold by Lessee times the purchase price per ton (2,000 pounds) agreed to be paid by the purchaser of such coal ... undiminished by any fees, transportation charges, commissions or taxes....

As the district court notes, the Amendment replaces the term "Gross Realization" with the term "Sales Price." The district court "reluctantly" agreed with Patriot's argument that the definition of "Gross Realization" was never changed when the Amendment was executed because of the different terms used. The court concluded that "Replacement of the term 'Gross Realization' by the term 'Sales Price' may very well have been a clever maneuver by Patriot, however, it does not make the language of the CIA ambiguous." Citing to Kentucky law, the district court stated that when contracts are "plain, unambiguous and fair" they cannot be reinterpreted by the courts and they should be

---

the issues in this case. Accordingly, we apply Kentucky law in determining the breach of contract issues presented in this appeal.

**3.** The CIA was amended in June 1990 and paragraph five, containing the definition of Gross Realization, was amended. However,

the Amendment still contained the provisions that severance and taxes would be excluded and that the definition of Gross Realization would be interpreted consistent with the definition of the term as agreed to by parties to the Reynolds Lease.

construed in accordance with their express terms. The court found that there was nothing ambiguous about the contracts as written and that, since the parties to the Reynolds Lease did not use the term "Gross Realization," the definition of that term in the CIA remained unchanged. The court concluded that the definition of "Gross Realization" was unchanged by the amendment to the Reynolds Lease and that Patriot was justified in taking deductions for severance and related taxes.

We agree with Appellants that, although the terms are different, the import of the terms is the same and a contrary reading would be unnecessarily obtuse. Furthermore, we disagree with the district court's determination that the replacement of the term "Gross Realization" by the term "Sales Price" does not render the CIA ambiguous. The replacement of terms in the Reynolds Lease creates an ambiguity as to the effect on the CIA of changes to the Reynolds Lease because the CIA references a material term that has been deleted, at least in name, from the Reynolds Lease. *See Transport Ins. Co. v. Ford,* 886 S.W.2d 901, 905 (Ky.1994) ("To determine that an ambiguity exists, the court must first determine that the contract provision is susceptible to inconsistent interpretations."). The Amendment, written ten years after the original Reynolds Lease, changes several of the material provisions of the Reynolds Lease concerning Article 3, entitled Royalties. Nearly every section of Article 3 is modified by the Amendment except for Sections 3.2(d), Lessee to Keep Records; 3.2(e), Time and Place of Payment of Production Royalty Payments; and 3.3, Refund or Credit for Certain Payments. The Amendment modifies several of the royalty amounts payable under the Reynolds Lease, but the language is identical to the language in the original Reynolds Lease, except for the use of the term "Sales Price" instead of

"Gross Realization." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.,* 94 S.W.3d 381, 385 (Ky.App.2002) ("Where a contract is ambiguous or silent on a vital matter, a court may consider parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties.").

It is unclear why the parties have selected a different term to describe the same concept. Regardless, it would be a strained reading of the Reynolds Lease and the Amendment to conclude that the term "Sales Price" was meant to signify something entirely different from the previously used term "Gross Realization," such that the term "Gross Realization" used in the CIA would have no equivalent term in the Reynolds Lease. *L.K. Comstock & Co., Inc. v. Becon Const. Co.,* 932 F.Supp. 948, 967 (E.D.Ky.1994) (Citing the Restatement of Contracts in interpreting a Kentucky contract: "[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect. Restatement (Second) of Contracts 203(a) (1979)"); *see also Robert H. Clarkson Ins. Agency, LLC v. Prof'ls Purchasing Group, Inc.,* No. 2002–CA–0000756–MR, 2003 WL 1860561, at *2 (Ky.App. Apr.11, 2003) ("A contract is to be construed to effectuate the intentions of the parties."). "Gross Realization" is one of the key terms in the Reynolds Lease, the CIA, and the CBA. Therefore, Amendment No. 4 clearly changed the determination of how royalties were to be calculated under the Reynolds Lease and it follows that the determination of payments under the CBA and the CIA are subsequently changed. Accordingly, we reverse the conclusion of the district court finding that the Amendment

did not change the definition of "Gross Realization" in the CIA. The Amendment changed the calculation of "Gross Realization" and provided that severance and related taxes would not be deducted in calculated royalty payments.

### C. Contingent Benefit Payments

Appellants argue that the district court erred in finding that only Pyramid was liable for contingent benefit payments resulting from the sale of the Reynolds Lease to Patriot. Patriot counters that Appellants are attempting to "extract windfalls" from its acquisition of the Reynolds Lease. The district court found that, given the language of paragraphs 3(b) and 4(b) of the CBA, Appellants were correct in their argument that they were entitled to contingent benefit payments as a result of the sale of the Reynolds Lease to Patriot. The district court rejected all three of Patriot's arguments in response—that the provision for contingent benefits was an unenforceable agreement to agree in the future; that the payment of the benefits was contingent upon Pyramid receiving additional consideration from the resolution of the on-going dispute with Reynolds regarding the Reynolds Lease; that Patriot is not liable because it did not receive "monetary consideration" for the sale of the Reynolds Lease, rather it paid for certain assets. After concluding that Appellants were entitled to benefits, the district court concluded that only Pyramid, and not Patriot, was liable for payment because Pyramid "was actually the party that received the monetary consideration" and Pyramid admitted that, if payments were due, it was responsible for such payments.

■ We disagree with the district court and find that Patriot, as an assignee of Pyramid, is liable to Appellants for the contingent benefit payments. Patriot misinterprets the plain language of the CBA and the Assignment Agreement by claiming that it is not responsible for the contingent benefit payments because it paid consideration for the Reynolds Lease and because other documents confirm that Patriot only assumed benefit obligations under the CBA and the CIA after the sale from Pyramid. Patriot also attempts to reargue its same assertions that Appellants are not entitled to contingent benefits. Patriot notes, "True, the District Court rejected this interpretation," but spends several pages in its brief again claiming that the provision for contingent benefits was unenforceable. Both of Patriot's arguments are meritless.

The CBA was created when Appellants sold their shares of DEW stock to Pyramid. The purpose of the CBA was to provide for the payment of money to Appellants from Pyramid in the event that Pyramid received money for:

> (a) an overriding royalty on coal sold from Area III; (b) any other monetary consideration relating to Area I, Area III, or to other Reynolds properties in Henderson County, Kentucky, to which [Pyramid] obtains mining rights pursuant to Paragraph 2.4 of the Reynolds Lease including any settlement of such rights with Reynolds....

The language of this provision is broad, but clear. *Robert H. Clarkson Ins. Agency*, 2003 WL 1860561, at *2 ("Absent an ambiguity in the contract, the parties' intentions must be discerned from the four corners of the instrument without resort to extrinsic evidence.").[4] Appellants are to

---

4. Patriot continues to argue that the CBA was limited to the resolution of the dispute regarding paragraph 2.4 of the Reynolds Lease. In support, Patriot quotes extensively from testimony of Poundstone and Hall in seeking to establish that Appellants understood that the

receive contingent benefits from Pyramid for *any* monetary consideration paid to Pyramid by *any* "other person or party." Therefore, the sums paid to Pyramid when it assigned the Reynolds Lease to Patriot obviously, as the district court concluded, entitled Appellants to a portion of those sums as provided for in the CBA. Appellants are not arguing for a "windfall," but rather for sums owed to them under the terms of the CBA.

Furthermore, the CBA clearly states that "This agreement ... shall continue until all Contingent Benefits Payments due hereunder are paid in full by Buyer [defined as Pyramid, any affiliate of Pyramid, DEW after Closing under the Letter Agreement, and any contractor, subcontractor, sublessee, assignee, successors to any interest of Pyramid of DEW to Area I or Area III]." On the same day that Patriot purchased the Reynolds Lease from Pyramid, Pyramid, DEW, and Patriot also executed an Assignment in which Patriot agreed to "assume all of the duties and obligations of DEW and Pyramid under the [CBA and the CIA] from the date of this Agreement." Clearly, one of Pyramid's obligations under the CBA was to make contingent benefit payments to Appellants, which arose when the Reynolds Lease was acquired by Patriot.[5] Through the operation of the Assignment, Patriot clearly and unequivocally assumed that obligation.[6] Accordingly, we reverse the finding of the district court that Patriot is not liable to Appellants as an assignee of

Pyramid's obligations and remand for the entry of judgment against Patriot on this issue.

### D. Calculation of Payments for Reductions in Production Royalty Rates

■ Appellants originally argued that Patriot miscalculated payments due to them under the CBA for a reduction in the production royalty payable under the Reynolds Lease. Patriot's response and counterclaim argued that it had actually overpaid Appellants by using the formula outlined in Amendment No. 4 to the Reynolds Lease. The district court found that Patriot had correctly calculated the payments due. Appellants appeal this determination arguing that Patriot used a "fictitious royalty rate" resulting in underpayment. Patriot cross-appeals the district court's denial of summary judgment for its counterclaim that it had overpaid contingent benefit payments due to Appellants under the CBA.

We agree with the district court, but remand this issue because we find that Gross Realization, as that term has been amended, should not include deductions for severance and related taxes. The contingent benefits at issue are paid to Appellants according to paragraph 4(c) of the CBA which states:

> [I]f the Benefit received is in the form of a reduction in the Production Royalty payable under the Reynolds Lease for coal produced from Area I and is less

---

CBA related only to the dispute regarding paragraph 2.4. The language of the CBA is very clear that is not limited to the dispute surrounding paragraph 2.4 of the Reynolds Lease. Therefore, extrinsic evidence is not necessary to explain or clarify the purpose the CBA and Patriot's argument is without merit.

**5.** There is no evidence to support, as Patriot argues, that its obligation under the Assignment would begin a day after the execution of

the agreement. These agreements were executed simultaneously and immediately gave rise to an obligation by Patriot under the CBA.

**6.** Thoroughly conducted due diligence would have alerted Patriot to its obligations to Appellants under the CBA in the event that it acquired the Reynolds Lease from Pyramid.

than eighty-five percent (85%) of the production royalty rates payable under the proposed Reynolds/Green lease document dated 10/25/86 relating to Area III, the Contingent Benefit payable to [Appellants] shall be fifty (50%) of such reduction below such eighty-five percent (85%) of such production royalty rates, but which shall not exceed the equivalent of one-half percent (.5%) of the Gross Realization as defined in Paragraph 5 of the [CIA] for all coal sold to consumers from Area I.

The district court found that "¶ 4(c) is terribly ambiguous. However, the parties seem to agree about what they intended ¶ 4(c) to do." According to Amendment No. 4 of the Reynolds Lease, the production royalty rate was calculated on a sliding scale and when the sales price [previously defined as Gross Realization] per ton decreased, the production royalty percentage rate also decreased. The Amendment also provided for a minimum production royalty payment of $1.26 per ton, to be used when the sales price hit a certain level.

Neither party disputes that contingent benefits are payable because both agree that the production royalty payments were decreased. However, the parties differ in the calculation of these rates. The district court found that it should look to production royalty rates payable under the Green Lease to determine the contingent benefits due to Appellants. The court concluded that in determining the amount of contingent benefits to be paid, the parties should compare the percentage rate actually paid by Patriot under the Reynolds Lease with the production royalty rates payable under the Green Lease. The court noted that Patriot argued that in the coal industry "rates are generally percentages and minimum payments are in dollar amounts." The court justified its acceptance of Patriot's calculation methods by stating that,

"Since the yardstick is a percentage rate, it seems entirely reasonable and appropriate to compare it to a figure which is also a percentage rate."

Patriot calculates the production royalty rate by determining the royalty rate that it must pay under the Reynolds Lease. Because market conditions have depressed the price of coal, Patriot must calculate the production royalty rates due at $1.26 per ton, the minimum payment. Patriot then divides the $1.26 by the sales price in order to determine the "effective royalty rate." Patriot then compares this rate with 85% of the royalty rates payable under the Green Lease to determine if the "effective royalty rate" is less. If it is, Appellants are owed a contingent benefit payment. In order to calculate the actual payment due, Patriot takes 50% of the reduction and multiplies it first by the Gross Realization (now called Sales Price) and then by the number of tons mined.

Appellants incorrectly argue that the language of paragraph 4(c) requires Patriot to pay them 50% of the difference between $1.26 per ton, the minimum royalty rate payable in the Reynolds Lease, and 85% of $1.90 per ton, the minimum royalty rate payable in the Green Lease. As the district court noted, such an interpretation is inconsistent with the language of the CBA. The only purpose of considering the Green Lease is to determine whether the reduction in royalty rates under the Reynolds Lease is less than 85% of the royalty rates under the Green Lease. In calculating the amount of contingent benefits payments due, the royalty rates under the Green Lease have no application. The payments are calculated solely based on the amount of the reduction of royalty payments in the Reynolds Lease. Accordingly, we affirm the district court's conclusion that the method used by Patriot in

calculating payments is correct, but we remand for calculation using the amount for Gross Realization as amended by Amendment No. 4, see *supra* Part B.

### E. Additional Contingent Interest Payments

■ Appellants argue that the district court erroneously determined that no contingent interest payments were due to them for coal mined from lands subsequently acquired by Reynolds. Appellants claim that they are entitled to payments from lands marked Area IVA, IVB, and the Allen Lease. Patriot argues that the CIA only applies to Area I and any lands acquired within Area I. The district court agreed with Patriot and found that the CIA only applied to Area I.

Appellants' argument is based on paragraph two of the CIA which states that:

The Contingent Interest Payments due hereunder shall be based upon the sale of coal by Buyer which has been produced from Area I as shown in a map attached to the Coal Mining Lease (the "Reynolds Lease") ... including coal lands included in said Area I which are hereafter acquired by Buyer.

The Reynolds Lease does not contain a map, but rather a metes and bounds description of Area I.[7] Amendment No. 3 to the Reynolds Lease states that "Lessor and Lessee have agreed to amend Exhibit A to the Lease to add additional properties described in Exhibit A–1 hereto and hereinafter referred to as the 'Additional Area'...." This area was referred to as Area IVB. In Amendment No. 4, the Reynolds Lease was amended to include additional properties referred to as Area

IVA and "known as the remainder of the Lessor's Area IV."

Appellants claim that the amendments resulted in an enlargement of Area I, but this is an untenable reading of the amendments. The district court was correct in concluding that the lands described in the amendments are separate lands that are not "included in said Area I which are hereafter acquired by Buyer." They are in fact lands that lay outside of Area I and are not included in the CIA. This is consistent with the language of the amendments that refers to "additional areas" and never references the areas as enlargements or additions to Area I. The additional areas are merely contiguous lands acquired after the execution of the Reynolds Lease. Accordingly, we affirm the district court's determination that Appellants are not entitled to contingent interest payments for Areas IVA and IVB.

Though the district court concluded that the CIA did not apply to Areas IVA and IVB, the court did find that the CIA applied to land known as the Allen Properties. Patriot cross-appeals this finding and argues that the Allen Properties were acquired by Pyramid prior to the execution of the CIA and that the CIA and the Memorandum of Agreement for the CIA contain language to exclude the Allen properties.

We agree with the conclusion of the district court that the CIA applies to the Allen Properties because they are clearly located within Area I. Patriot acknowledges that "True, the boundaries of Area I, as depicted in the Memorandum of Agreement map, encompass the Allen Property." Accordingly, the language of

---

7. The district court mistakenly states that Exhibit A in the Reynolds Lease contained a map which clearly marked the boundaries of Area I. However, there is no map attached to the Reynolds Lease presented in the record.

Patriot submitted a map of Areas I—V in support of its summary judgment motion and the boundaries of the areas on the map are clearly marked.

the CIA will be read as written and the CIA applies to "the sale of coal by Buyer which has been produced from Area I." There is no provision explicitly excluding the Allen Property and therefore we affirm the decision of the district court that the Allen Property is contained in Area I.

### F. Contingent Benefit Payments for Reduction in Royalty Rates for Deep or Underground Mined Coal

■ Appellants argue that the district court erred in denying its claim for contingent benefit payments for the reduction in royalty rates for deep or underground mined coal that Patriot negotiated in Amendment No. 4. Appellants argue that even though the CBA does not provide for the amount of contingent benefit payments to be made in the event that Patriot realized a reduction in production royalty rates, they are entitled to quasi-contractual relief because the unenforceable provision is not severable from the rest of the contract. Patriot argues that the provisions are severable and an equitable remedy is applicable in this case. The district court found that even though the terms of the CBA may provide for contingent benefit payments, the remedy provided is unenforceable because it is an agreement to agree in the future.

Appellants, quoting a Tennessee case, argue that because they have performed their duties by conveying all of their stock in DEW to Pyramid according to the Letter Agreement, they are entitled to quasi-contractual relief even though paragraph 4(d) is unenforceable. Appellants argue that such equitable relief is often recognized in services contracts, even though the price has not been fixed, in order to prevent situations in which individuals are not compensated for their labor. This argument is without merit. Payments under the CBA are not made directly in return for the sale of stock or any services rendered and the CBA is not a services contract. Furthermore, the unenforceable terms of the CBA are completely severable from the rest of the contract.

A reduction in the production royalty rates for deep or underground mined coal is a contingent benefit because paragraph 3(d) of the CBA provides that "Contingent Benefits shall be the receipt by [Pyramid] from any other person or party ... [of] (d) any reduction in any advance royalty or other changes ... that constitutes an economic benefit to [Pyramid] relating to Area I, Area III, or to other Reynolds properties...." However, paragraph 4(d) states that "with respect to item (d) in Paragraph 3 hereof, Buyer and Sellers shall negotiate in good faith to mutually determine the value of any Contingent Benefit by Buyer and the appropriate sharing with Sellers...." It is well-established in contract law that agreements to agree in the future are unenforceable. *See Cinelli v. Ward*, 997 S.W.2d 474, 477 (Ky. App.1998) ("Where an agreement leaves the resolution of material terms to future negotiations, the agreement is generally unenforceable for indefiniteness unless a standard is supplied from which the court can supplant the open terms should negotiations fail."). Though the CBA provides for the payment of contingent benefits, it does not provide for the calculation of those benefits in this situation, providing only that the parties "negotiate in good faith." Furthermore, there is no standard from which we can supply the missing material terms. Accordingly, the Appellants are not entitled to benefits for deep-mined coal because the provision is unenforceable.

Appellants also argue in the alternative that even if they are not entitled to contingent interest payments for coal mined in Area IVB, see *supra* Part III.E., they are

entitled to contingent benefit payments for that area. The district court found that an additional 15 million tons of coal were added to the Reynolds Lease pursuant to Amendment No. 3, and that this additional coal was a contingent benefit as defined in paragraph 3(d) of the CBA. However, the district court found that Appellants were not entitled to a benefit because paragraph 4(d) of the CBA, which provides for the calculation of such a benefit, was unenforceable. We need not discuss whether the additional 15 million tons of coal should be considered a contingent benefit under the CBA, because we again agree with the district court that paragraph 4(d) of the CBA is an unenforceable agreement to agree. Accordingly, we affirm the district court's conclusion that Appellants are not entitled to contingent benefit payments for coal mined in area IVB.

## G. Sales Price Calculation

■ Appellants next argue that the district court erred in finding that the payments made to them under the CBA and the CIA could be based on the sales price for coal received from affiliated entities. They argue that the price at which Patriot sold coal to its affiliates was below market price and those affiliates then sold the coal at a higher price to their consumers. Appellants claim that there is an implied duty for Patriot to sell the coal at the highest reasonable market price and the sales price should be based on the price sold to consumers. Appellants also argue that Patriot's marketing of the coal via affiliated companies for a higher price than that which Appellants' payments are calculated is a "blatant breach of the good faith and fair dealing duty." Patriot argues that the Settlement Agreement released possible claims that were known at the time it was executed in 1990 and because Appellants knew of this claim at the time, it must now be dismissed. Patriot also argues that

they breached no duty because they paid Appellants according to the express language of the contract and applicable amendments.

In the district court, Appellants based their argument on a provision in the CBA that said that Gross Realization was to be based on "coal sold to consumers." However, the district court found that the language in the CBA had been amended and replaced with language stating that Gross Realization would be based on "all coal sold." The arguments presented by Appellants to this Court are therefore new, yet meritless. The language of the CBA, as amended, is clear and the calculation of the Gross Realization is based on the price of "all coal sold" without differentiating between customers and affiliates. Appellants' argument that mineral lessees have a duty to sell their coal for market price is unpersuasive. The CBA is clear and there is no provision that the coal must be sold at the prevailing market price. Furthermore, it makes no sense, and there is no support in the CBA, to calculate price based on the price that the affiliates subsequently received from their consumers. Accordingly, we affirm the decision of the district court denying the Appellants' motion for summary judgment on the issue of sales price.

## H. Dismissal of Appellants' Sales Tax Claim

■ Appellants claim that Pyramid, then Patriot, improperly deducted $.05 per ton for sales tax in calculating the payments due to them under the CBA and the CIA. Patriot argues that Appellants forfeited this claim in the Settlement Agreement executed in 1990. The district court found that Appellants knew of this deduction but did not raise an objection and the language of the Settlement Agreement extinguished the claim.

The language of the settlement provided "First Parties and Pyramid hereby release, acquit and forever discharge ... from any and all claims, causes of action ... which were known ... arising out of or relating to the [CBA] or the [CIA]." Appellants did not raise an objection to the sales tax at the time and therefore are unable to raise the claim currently. Furthermore, Appellants acquiesced without objection to the deduction for nine years. This provides further support that Appellants are unable to currently challenge the sales tax deduction. *L.K. Comstock,* 932 F.Supp. at 966 ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement. Restatement (Second) of Contracts 202(4) (1979)").

### I. Dismissal of Tort Claims

#### 1. Negligence claim

■ Appellants appeal the dismissal by the district court of their negligence claim. Appellants argue that Patriot breached its duty to exercise good faith and use ordinary care in its calculation of the payments due to them under the CBA and the CIA. The district court found that Appellants' negligence claim was not distinct from their breach of contract claim and therefore dismissed the tort action. We agree with the district court that the Appellants' claim concerning the miscalculation of payments is a claim under contract law arising from the terms of the CBA and the CIA. There is no tort action here because the duties imposed on these parties are a result of contractual agreements and not tort law. *See Agnew Truck Serv., Inc. v. Ranger Nationwide, Inc.,* No. C 90–0034P(J), 1992 WL 437629, at *3 (W.D.Ky.

1992)("The Court can find no basis for finding that negligence law governs the issues arising out of the parties' contractual agreements.").

#### 2. Fraud claim

■ Finally, Appellants argue that Patriot's miscalculation of payments due under the CBA and the CIA as discussed, *supra* Parts III.B. and D., amounted to fraud. The district court found that Appellants were unable to assert claims of fraud against Patriot regarding the sales tax deduction or the calculation of the "effective royalty rate" to determine the contingent benefit payments due. The court found that Appellants were only able to assert an argument that the Patriot made a material misrepresentation which is false concerning the washing costs deduction on unwashed coal. Patriot acknowledged its mistake and the court found that Appellants could not prove that Patriot knew that there was a material misrepresentation when the royalty statement was sent.

To prove fraud, Appellants must establish: "1) a material misrepresentation; 2) which is false; 3) which was known to be false or made recklessly; 4) made with inducement to be acted upon; 5) which is acted on in reliance thereon; and 6) causes injury." *Johns Hopkins Hosp. v. Peabody Coal Co.,* 920 F.Supp. 738, 742 (W.D.Ky. 1996). Appellants argue that the deduction of severance and related taxes was fraudulent. Though we have determined that the district court erred in determining that severance and related taxes were deductible from the sales price in calculating the contingent interest payments due, see *supra* Part B, there is no evidence that Patriot knew that deducting these costs was incorrect. Patriot deducted the cost pursuant to the language of a contract

provision that it believed applied to the calculation of the payments and this belief was neither false or reckless, though we now hold that Patriot was wrong in its application of the provision.

Appellants also argue once again that the "effective royalty rate" calculated by Patriot and used to determine the contingent benefit payments due, see *supra* Part III.D., was a material misrepresentation, which was false and which was known to be false. *Smith v. Barton,* 266 S.W.2d 317, 318 (Ky.1954) ("[I]ntent to deceive is a necessary element of actual fraud."). Because we have already determined that Patriot's use of the "effective royalty rate" was correct, Appellants are unable to establish a claim for fraud. Accordingly, there is no action for fraud against Patriot for its miscalculation of the contingent interest payments or for its calculation of contingent benefit payments.

### J. Patriot's Defenses of Estoppel, Laches, and Waiver

Patriot cross-appeals the district court's denial of summary judgment on all of the Appellants' claims based on the defenses of estoppel, laches, and waiver. Specifically, Patriot argues that these defenses apply because Appellants knew of Pyramid's acquisition of rights to Area IV after the 1988 settlement with Reynolds, and knew of the tax deductions, see *supra* Parts III.B., G. and I., the CBA calculations, see *supra* Part III.C., and the sales price information, see *supra* Part III.G. Additionally, Patriot argues that Appellants accepted royalty checks after the sale of the Reynolds Lease to Patriot and the execution of Amendments No. 3 and 4 without dispute. Patriot argues that the district court did not address Kentucky precedent that states that one cannot accept royalty payments without objection and then later assert a claim for additional sums. Patriot

points specifically to *Lafitte Co. v. United Fuel Gas Co.,* 177 F.Supp. 52 (E.D.Ky. 1959), and *P.V. & K. Coal Co. v. Kelly,* 301 Ky. 180, 191 S.W.2d 231 (Ky.1945), to support its argument that the doctrines of estoppel and laches apply. Specifically, Patriot claims that Appellants' acceptance of royalty payments without objection satisfies the doctrines of estoppel and laches. Also, Patriot argues that Appellants waived their rights to assert their claims because they cashed their royalty checks without objection after executing the Settlement Agreement in 1990. We find that Patriot's defenses are without merit.

#### 1. Estoppel

The essential elements of an estoppel claim are: "(1) [c]onduct, including acts, language and silence, amounting to a representation or concealment of material facts; (2) the estopped party is aware of these facts; (3) these facts are unknown to the other party; (4) the estopped party must act with the intention or expectation his conduct will be acted upon; and (5) the other party in fact relied on this conduct to his detriment." *Gray v. Jackson Purchase Prod. Credit Ass'n,* 691 S.W.2d 904, 906 (Ky.App.1985). As the district court found, Appellants' behavior does not support a finding of estoppel. Even if Appellants accepted the royalty checks knowing that the amount was wrong, Patriot has presented no evidence that it detrimentally relied on Appellants' actions. As the district court noted, Appellants' acceptance of the checks merely caused Patriot to continue paying less than was actually owed—this is not a detriment to Patriot. Accordingly, we affirm the district court's denial of summary judgment based on estoppel.

#### 2. Laches

Patriot also argues that the district court erred in denying its motion for

summary judgment based on the defense of laches. The district found that Patriot presented no evidence showing that the Appellants' delay in asserting its claims caused prejudice.

In order to establish a defense of laches, "one claiming a bar based on delay must also show prejudice." *Plaza Condo. Ass'n, Inc. v. Wellington Corp.*, 920 S.W.2d 51, 54 (Ky.1996). Laches "is not merely delay, but delay that results in injury or works a disadvantage to the adverse party." *Id.* As the district court found, Patriot has shown no evidence that it was prejudiced by Appellants' delay in filing their claims.

Patriot attempts to point this Court to *P.V. & K. Coal* to support its contention that its "purchase of the mining assets and investment of time and resources (prior to learning of Plaintiff's claims) certainly qualifies as prejudice." *P.V. & K. Coal* is inapplicable to the present case. In that case, the court ruled that laches applied because the appellees had accepted royalty checks for twenty-five years without complaint. *P.V. & K. Coal*, 191 S.W.2d at 233–34. The court found significant the fact that the appellees lived close to the mine at issue and were aware of the difficulty in mining coal from the land and the considerable resources expended by the coal company to mine the land. *Id.* The court found that the coal company was prejudiced because it continued to spend resources to attempt to mine the land, while not being informed by the appellees that they were dissatisfied with the progress being made and the royalty checks they were receiving. *Id.* Appellants here were not receiving checks for twenty-five years while silently being dissatisfied. They accepted the checks in good faith and when they discovered that miscalculations had been made, they took action. Their acceptance of royalty payments in no way prejudiced Patriot or caused them unnecessarily to expend resources on purchasing the mining assets or other expenditures.

Furthermore, Patriot's reliance on *Lafitte* is equally unpersuasive. In *Lafitte*, the plaintiff received royalty checks from a gas lease for twenty-eight years without objection. 177 F.Supp. at 68. They then brought an action alleging that additional royalties were due under the terms of the lease. *Id.* at 57–58. The court found that estoppel and laches applied to the plaintiffs claims because

> [T]he status of the parties over the years has materially changed. To realize the full impact of the change we have but to consider the almost insurmountable difficulty which would arise if the prayer of the complaint should be sustained. The defendant is a utility company and public service corporation. Its rates, intra and interstate communications, and delivery of gas are subject to the legislative authority of the State of Kentucky and the congressional authority of the Congress of the United States.... This is a clear case for the equitable defenses of estoppel and laches.

*Id.* at 68. There are no such issues in this case. Most important, the status of the parties in this case has not changed materially from the time the CBA and the CIA were executed until the time of the present action. Furthermore, the royalty payments due to Appellants are not the result of externally set prices, as was the case in *Lafitte*, rather they are based on contracts negotiated between Patriot and its customers. Thus, there is no "insurmountable difficulty" in providing relief to Appellants. Accordingly, we affirm the district court's decision to deny summary judgment on the defense of laches.

### 3. *Waiver*

Finally, Patriot cross-appeals the district court's decision denying its motion

for summary judgment on the issue of waiver. Patriot argues that the execution of the 1990 Settlement Agreement and the receipt and acceptance of royalty checks amounts to a waiver by Appellants of all claims. The district court found that there was no evidence Appellants had given up a known right. We again agree with the district court.

In Kentucky:

[W]aiver exists only where one with full knowledge of a material fact does or forbears to do something inconsistent with the existence of the right or of his intention to rely upon that right. Knowledge of the existence of the right on the part of the party claimed to have made the waiver is an essential prerequisite to its relinquishment. No one can be said to have waived that which he does not know, or where he has acted under a misapprehension of the facts.

*Harris Bros. Const. Co. v. Crider,* 497 S.W.2d 731, 733 (Ky.1973) (citations omitted). Patriot has presented no evidence to support its conclusion that Appellants have waived their claims. The settlement agreement that was reached in 1990 did not forever bar Appellants from raising issues regarding the payments under the CBA or CIA. The Settlement Agreement related only to a specific lawsuit between Appellants and Pyramid and stated that "claims ... arising out of or relating the claims asserted, or which could have been asserted, in that certain civil action styled *D.C. Hall, Jr., et al. v. Pyramid Mining, Inc. ...*" were barred. It also barred claims relating to the CBA or CIA "which were known or in the exercise of reasonable diligence should have been known as of the date hereof." This provision clearly relates to claims that could have been brought at the time of the settlement in June 1990. However, the settlement in no way bars claims not relating to the earlier

suit or that could not have been brought in that earlier suit. The Settlement Agreement in no way acts as a waiver of claims brought nearly ten years later and the present action by Appellants is not inconsistent with the execution of the Settlement Agreement. Accordingly, we affirm the finding of the district court that Appellants have not waived intentionally their rights to bring the present claims.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** in part and **REVERSE** and **REMAND** in part the judgment of the district court.