*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0169p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

W.N. POUNDSTONE, D.C. HALL, JR., E.R. PHELPS, DENNIS HALL,

　　　　　　　　　　　*Plaintiffs-Appellees/*
　　　　　　　　　　　*Cross-Appellants,*

　　　*v.*

PATRIOT COAL CO., LTD.,

　　　　　　　　　　　*Defendant-Appellant/*
　　　　　　　　　　　*Cross-Appellee.*

> Nos. 05-5344/5421

Appeal from the United States District Court
for the Western District of Kentucky at Owensboro.
No. 97-00187—Joseph H. McKinley, Jr., District Judge.

Argued: November 28, 2006

Decided and Filed: May 10, 2007

Before: MARTIN and GUY, Circuit Judges; ROSE, District Judge.[*]

---

## COUNSEL

**ARGUED:** David Domene, BLACKBURN, HUNDLEY & DOMENE, Louisville, Kentucky, for Appellant. George E. Stigger, St. Marys, Georgia, for Appellees. **ON BRIEF:** David Domene, Winfrey P. Blackburn, Jr., BLACKBURN, HUNDLEY & DOMENE, Louisville, Kentucky, for Appellant. George E. Stigger, St. Marys, Georgia, for Appellees.

---

## OPINION

---

　　　BOYCE F. MARTIN, JR., Circuit Judge. In this action for breach of contract, Defendant Patriot Coal Co. appeals certain orders entered by the district court related to the calculation of damages, and asks us to modify the law of the case by finding that a decision by a prior panel of this Court was clearly erroneous. Plaintiffs D.C. Hall, Jr., Ed Phelps, Dennis Hall, and William Poundstone cross-appeal, challenging the interest rate selected by the district court to govern the award of prejudgment interest. For the following reasons, we affirm the district court's decisions,

---

[*] The Honorable Thomas M. Rose, United States District Judge for the Southern District of Ohio, sitting by designation.

decline the invitation to modify the law of the case, and reverse only with regard to Plaintiffs' cross-appeal as to the prejudgment interest rate required by Kentucky law.

I.

The four issues before us now are a small subset of those that have been raised during the entire course of this litigation, and we set forth here only the facts that are centrally relevant to the issues that are raised in this appeal — the second in this case. A more complete version of the facts is reported in the decision of the first panel, *Poundstone v. DEW Res., Inc.*, 75 F. App'x 353, 357 (6th Cir. 2003).

Plaintiffs formed a corporate entity, DEW Resources, and entered a coal mining lease with Reynolds Metal Company (the "Reynolds Lease") to mine and develop certain coal reserves in Henderson County, Kentucky in 1984. The following year, DEW subleased the property to Defendant Pyramid Coal Company. Plaintiffs subsequently sold their stock in DEW to Pyramid for $1.2 million, and entered into two separate agreements with Pyramid that called for Plaintiffs to receive certain contingent benefits for profits recognized from the property. These agreements were entitled the Contingent Benefit Agreement (or "CBA") and the Contingent Interest Agreement (or "CIA").

In 1994, Pyramid sold its mining assets to Defendant/Appellant Patriot Coal Company, including its rights under the lease of the mining property it had received from Plaintiffs. As part of the deal, Patriot explicitly agreed in a separate Assignment Agreement to assume the duties and obligations Pyramid owed to Plaintiffs, including the CBA and CIA. A dispute later arose over the benefits owed to Plaintiffs under their original sale of stock to Pyramid, and Plaintiffs filed this lawsuit on September 16, 1997 against Pyramid, Patriot, and DEW to recover payments they claimed were owed to them under that arrangement.[1] Jurisdiction lay in the district court based on the parties' diversity of citizenship under 28 U.S.C. § 1332.[2]

The district court initially granted summary judgment on behalf of Plaintiffs on several of their contractual claims while rejecting several others. Plaintiffs appealed, and Patriot cross-appealed the district court's denial of its defenses of estoppel, laches, and waiver. On September 3, 2003, a panel of this Court reversed the district court's conclusion that Pyramid — and not Patriot — was solely liable for the contingent benefits payments to Plaintiffs resulting from the sale of the Reynolds Lease to Patriot. 75 F. App'x 353 (2003). The panel also reversed the district court's ruling regarding the meaning of an amendment to the CIA involving the method of calculating royalties owed to Plaintiffs. *Id.* The panel affirmed all the other relevant portions of the district court's summary judgment order, including those challenged by Patriot in its cross-appeal. *Id.*

After remand, Patriot filed another motion for summary judgment in the district court, urging the district court to ignore this Court's ruling because it was clearly erroneous, and seeking a ruling that it only owed Plaintiffs payments based on coal sold by Pyramid after April 19, 1994, the date the Reynolds Lease was assigned from Pyramid to Patriot. The district court denied Patriot's summary judgment motion, rejecting its request to depart from the Sixth Circuit mandate, and ruling that Patriot owed payments based on all coal sales both before and after April 19, 1994. The case was then referred to a magistrate to determine the amount of the contingent benefits that Plaintiffs were owed. The district court subsequently adopted the magistrate's recommendation, except for

---

[1] Patriot is the only defendant that remains a party to the present appeal.

[2] The Plaintiffs are citizens of Florida, Oklahoma, and Kansas, and the Defendant corporations are incorporated in Mississippi, Delaware, and Kentucky, and all maintain their principal place of business in Kentucky. The amount in controversy is over $75,000.

the recommended prejudgment interest rate. While the magistrate had recommended an interest rate of eight percent, the district court instead chose five percent.

Patriot now appeals, raising two arguments related to the denial of its post-remand summary judgment motion: first, that this panel should set aside the original panel order that Patriot is liable for the sale of lease liability to Plaintiffs, and second, that the district court's decision as to Patriot's liability on coal sold both before and after the assignment of the lease should be reversed. Patriot also appeals the district court's subsequent grant of prejudgment interest against it. Plaintiffs cross-appeal on the amount of prejudgment interest, contending that the district court abused its discretion in selecting a prejudgment interest rate of five percent instead of eight percent.

II.

Three separate standards of review apply to the issues raised in this appeal. First, Patriot's request that this panel modify the law of the case as determined by the prior panel can only be granted if the earlier decision was clearly erroneous. *Coal Resources, Inc. v. Gulf & Western Industries, Inc.*, 865 F.2d 761, 767 (6th Cir. 1989). Second, Patriot's appeal of the district court's post-remand summary judgment order that Plaintiffs are owed contingent benefit payments for the time both before and after the assignment of the lease is reviewed de novo. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005). Finally, the challenges by both parties to the award of prejudgment interest is reviewed for an abuse of discretion. *Conte v. General Housewares Corp.*, 215 F.3d 628, 633 (6th Cir. 2000). The parties agree that Kentucky law governs the dispute.

III.

### A. Was the prior panel decision that Patriot assumed the liability for payments to Plaintiffs for the sale of the Reynolds Lease clearly erroneous?

The prior panel decision that Patriot assumed the liability for payments to Plaintiffs for the sale of the Reynolds Lease based on the assignment from Pyramid to Patriot is now the law of the case. As such, we are precluded from reaching a different conclusion "unless one of three 'exceptional circumstances' exists: [1] the evidence in a subsequent trial was substantially different; [2] controlling authority has since made a contrary decision of law applicable to such issues; or [3] the decision was clearly erroneous, and would work a substantial injustice." *Coal Resources*, 865 F.2d at 767. The first two circumstances — different evidence in a subsequent trial or a change in the law — are not applicable here. Thus, to warrant relief from the prior panel's decision and the district court's order on remand, Patriot must show that the decision was clearly erroneous *and* would work a substantial injustice.

When Pyramid bought the outstanding stock of DEW from Plaintiffs in 1988, the two sides entered the CBA (in this case, the Contingent Benefits Agreement, as opposed to a collective bargaining agreement) and CIA (the Contingent Interest Agreement, not the Central Intelligence Agency). These two agreements provided for payments to Plaintiffs based on profits from the future development of the Reynolds Lease land by Pyramid and its successors. The CBA provides in pertinent part as follows:

> 3. "Contingent Benefits" shall be the receipt by Buyer from any other person or party of (a) an overriding royalty on coal sold from Area III; (b) any other monetary consideration relating to Area I, Area III, or to other Reynolds properties in Henderson County, Kentucky, to which Buyer obtains mining rights pursuant to Paragraph 2.4 of the Reynolds Lease including any settlement of such rights with Reynolds. . .

4.

. . .

(a) With respect to item (a) in Paragraph 3 hereof, if the Contingent Benefit received by Buyer is in the form of an overriding royalty, for coal produced from Area III, fifty percent (50%) shall be payable to Sellers, provided, however, the amount payable to Sellers shall not exceed the equivalent of one-half (.5%) percent of the Gross Realization for all coal sold to consumers as defined in Paragraph 6 hereof.

(b) With respect to item (b) of Paragraph 3 hereof, Buyer and Sellers shall negotiate in good faith to determine the portion of the other monetary consideration which shall be payable as a Contingent Benefit to Sellers, provided however that the amount of the Contingent Benefit payable to sellers pursuant to item (b) of Paragraph 3 hereof shall be the lesser of (i) fifty percent (50%) of the monetary consideration received by Buyer, or (ii) the equivalent of one-half percent (0.5%) of the Gross Realization as defined in Paragraph 5 of the Contingent Interest Agreement from Area I for all coal sold to consumers.

Joint App'x at 35-37. The term "Buyer" is defined in the CBA as "Pyramid, any affiliate of Pyramid, DEW after Closing under the Letter Agreement, and any contractor, subcontractor, sublessee, assignee, successor to any interest of Pyramid or DEW. . . ." *Id.*

Based on these provisions (most significantly ¶4b), the district court ruled in its initial summary judgment order that Pyramid was liable to Plaintiffs for a portion of its profits from its assignment of the Reynolds Lease to Patriot. The district court noted that the purchase price paid by Patriot was $18 million, over $11 million of which was allocated for coal reserves associated with the lease. This payment qualified as "other monetary consideration" pursuant to paragraph 4(b), entitling Plaintiffs to a portion of the proceeds. The district court agreed with Patriot, however, that because Pyramid was the party receiving the money consideration, Pyramid owed the payment to Plaintiffs rather than Patriot.

In the prior appeal, this Court agreed with the district court that a payment was owed to Plaintiffs based on the assignment of the lease, but reversed the district court's ruling that Pyramid, rather than Patriot, was liable for the payment. The panel first rejected Patriot's argument that Plaintiffs were not entitled to contingent benefits for the assignment of the lease, based on the other monetary consideration provision in ¶4b of the CBA — the same provision on which the district court relied. 75 F. App'x at 360-61. Initially, this obligation lay with Pyramid, the recipient of the monetary consideration from Patriot. On the same day Patriot purchased the Reynolds Lease, however, it executed the separate Assignment Agreement in which it agreed to "assume all of the duties and obligations of DEW and Pyramid under the [CBA and the CIA] from the date of this Agreement." Joint App'x at 54, 56. Thus, the panel ruled that "one of Pyramid's obligations under the CBA was to make contingent benefit payments to [Plaintiffs], which arose when the Reynolds Lease was acquired by Patriot. Through the operation of the Assignment, Patriot clearly and unequivocally assumed that obligation."[3] 75 F. App'x at 360-61. For this reason, the panel reversed the district court and ruled that Patriot was liable for the sale of the lease liability owed to Plaintiffs as Pyramid's assignee. *Id.* This is the ruling that Patriot now claims was clearly erroneous.

---

[3]The panel found further support for this ruling in the CBA's definition of the term "Buyer," which was used to designate the party responsible for paying the contingent benefits, as "any . . . sublessee, assignee, successor in interest of Pyramid." *Id.* This definition included Patriot after it was assigned the Reynolds Lease.

To overcome the high hurdle of arguing that a prior decision of this Court was clearly erroneous, Patriot relies on an additional document, which it claims the prior panel ignored in ruling that it was liable for contingent benefit payments based on the assignment of the lease. This document is a memorandum sent from Duncan Campbell, President of Pyramid, to James Sevem of Patriot on April 18, 1994, the day before Patriot and Pyramid executed the lease assignment. The "Campbell memorandum" references the Assignment that the parties had negotiated, and specifies that

> (1) It is specifically agreed that Patriot and/or Bluegrass[4] is only assuming the current amount of royalty being paid pursuant to the CIA or CBA.
> (2) Any increase in the royalty related to the CIA or CBA resulting from the proposed transaction to be completed tomorrow (4-19-94) shall be the liability of Pyramid. It is confirmed and agreed that Patriot and Bluegrass are not assuming any such liability.

Joint App'x at 230.

This time, Patriot does not contend that no payment is owed to Plaintiffs for the proceeds realized from the sale of the Reynolds Lease, despite Plaintiffs' argument that Patriot is now attempting to modify the payments owed to Plaintiffs under the CBA. Instead, Patriot argues that when it contracted with Pyramid for the assignment of the lease, the parties were free to assign the CBA obligations as they saw fit. Patriot argues convincingly that the Campbell memorandum is part of the single agreement between Patriot and Pyramid, given that it was executed a day before the Assignment, it in fact references the Assignment, and it clarifies the terms of the Assignment without conflicting with them. *See ABCO-BRAMER, Inc. v. Markel Ins. Co.*, 55 S.W.3d 841, 845 (Ky. Ct. App. 2000) ("Under Kentucky law, a contract must be construed as whole, and all writings that are part of the same agreement are construed together."); *Menefee v. Rankins*, 158 Ky. 78, 83 (Ky. 1914) ("A new contract with reference to the subject-matter of a former one does not supersede the former and destroy its obligations, except in so far as the new one is inconsistent therewith, when it is evident from an inspection of the contracts and from an examination of the circumstances that the parties did not intend the new contract to supersede the old, but intended it as supplementary thereto."). Patriot further claims that the Campbell memorandum modifies the Assignment to exclude the sale of lease liability at issue here.

Although the Campbell memo should be read contemporaneously with the Assignment under Kentucky law, the terms of the several relevant documents simply do not indicate a modification of Patriot's assumption of the contingency benefits owed to Plaintiffs based on the sale of the lease. The definition of Contingent Benefits in ¶3 of the CBA includes, among several other benefits, the funds received by Pyramid or its successors "from any other person or party of (a) an overriding royalty on coal sold from Area III; (b) any other monetary consideration relating to Area I, Area III, or to other Reynolds properties in Henderson County, Kentucky, to which Buyer [defined as Pyramid and its successors] obtains mining rights pursuant to Paragraph 2.4 of the Reynolds Lease." Under ¶4(b), a portion of "other monetary consideration" received by "Buyer" is owed to Plaintiffs. The district court and the prior panel both ruled that ¶4(b) required payment to Plaintiffs based on Pyramid's assignment of the Reynold's Lease. The CBA also provides that this obligation is binding on any of Pyramid's successors. Joint App'x. at 34, 35 (providing that the CBA "shall continue until all Contingent Benefit Payments due hereunder are paid in full by Buyer," and defining "Buyer" as "Pyramid, . . . and any contractor, subcontractor, sublessee, assignee, successors to any interest of DEW to Area I or Area III.").

---

[4]Bluegrass was an entity affiliated with Patriot at the time of the transaction.

Most significantly, as the prior panel ruled, this obligation owed to Plaintiffs under the CBA was expressly assigned to Patriot along with the assignment of the lease in the Assignment Agreement, in which Patriot agreed to "assume[] all of the duties and obligations of DEW and Pyramid under the [CBA and CIA] from the date of this Agreement." Joint App'x at 56, 210. The provisions of the Campbell memo, which Patriot argues modified the Assignment, explicitly only relate to the "current amount of royalty," or any "increase in royalty," stating that Pyramid remains liable for those obligations. Joint App'x at 230. While the memo might modify the assignment of *royalty* obligations as between Patriot and Pyramid, the payments for the assignment of the lease are not "royalties" under the CBA. Rather, the CBA has separate provisions governing royalties on the one hand, and *other monetary consideration*, on the other. As this Court and the district court have already ruled, the obligation owed Plaintiffs based on the assignment of the lease was based on the "other monetary consideration" clause (¶4b) — not the "royalties" clause (¶4a). For this reason, even though the Campbell memo should be interpreted as part of the agreement between Patriot and Pyramid, it does nothing to modify the contingent benefit payments owed to Plaintiffs under ¶4b of the CBA for the assignment of the Reynolds Lease.[5]

It may seem somewhat counter-intuitive that by buying out the Reynolds Lease from Pyramid, Patriot could become liable for Pyramid's contingent benefit payments to Plaintiffs that became due because Pyramid received "other monetary consideration" from Patriot for the assets covered by the lease. Patriot's liability for this payment, however, is clearly created by the Assignment, and unmodified by the Campbell memorandum. Had Patriot and Pyramid chosen to allocate this obligation from the CBA differently between themselves, they certainly could have done so in the Assignment. It could be that Pyramid and Patriot agreed to transfer this obligation as part of the bargained-for consideration for their deal. Such an agreement could have the effect of reducing the purchase price, with the beneficial result for both parties that the obligation owed to Plaintiffs would necessarily be less.[6] Alternatively, it could be the case that Patriot did not appreciate the liability that it was taking on when it executed the Assignment. To this effect, as the prior panel noted, "[t]horoughly conducted due diligence would have alerted Patriot to its obligations under the CBA." Either way, any hindsight speculation regarding the dynamics behind this business deal present no basis for us to look beyond the plain language of the Assignment. We find that the prior panel's ruling on this issue was well supported by the relevant agreements entered into by the parties, and can hardly be said to be clearly erroneous.

---

[5]The parties quibble over whether the prior panel was even aware of the Campbell memo. Patriot argues that the panel ignored the memo altogether, while Plaintiffs contend that the reference in the opinion to "other documents [that] confirm that Patriot only assumed benefit obligations under the CBA and CIA after the sale from Pyramid," indicates that the panel was aware of the memo and deemed it inapplicable, which the district court also speculated might have occurred. The fact that the memo modifies royalty payments, rather than "other monetary consideration" might explain why the prior panel only made such a passing reference to it.

[6]Assume as a rough illustration, the following hypothetical. Patriot and Pyramid agree before making their deal that the value of the leasehold interest in the mine is around $20 million. In a very simplified version of the CBA and CIA, Plaintiffs are owed 50% of the benefit received by Pyramid for this transaction. Both parties realize that if Patriot simply makes a lump payment to Pyramid for this amount, without separately assuming Pyramid's duties under the CBA, then Pyramid will owe Plaintiffs $10 million, and will only receive $10 million themselves. Instead, to improve both of their positions, Pyramid and Patriot agree to a discount for the payment for leasehold interest to the mine — say to $12 million — in exchange for Patriot's agreement to take on responsibility for the percentage owed to Plaintiffs for the sale of the lease, in addition to the future royalties and other contingent benefits they will already owe Plaintiffs under the CBA (which is binding on them as a successor of Pyramid). Under this scenario, Patriot would pay a total of $18 million instead of $20 million ($12 million to Pyramid and $6 million to Patriot), while Patriot will receive an additional $2 million, and the $4 million difference will come out of the amount paid to Plaintiffs. Clearly, under such an arrangement, Patriot would have received a sizeable benefit from its bargain to take on the liability owed to Plaintiffs, and allowing them to later shirk the responsibilities of this agreement would be entirely unjust and nonsensical.

### B. Did the district court incorrectly determine the time frame for payments owed by Patriot to Plaintiffs?

In its post-remand summary judgment order, the district court ruled that the time frame for which Plaintiffs should receive a contingent benefit for coal sales under the CBA included the time both before and after the assignment of the lease from Pyramid to Patriot on April 19, 1994. Patriot now appeals this ruling, arguing that the CBA was only intended to provide contingent benefits for coal sales preceding the assignment of the lease from Pyramid to Patriot. This argument is simply at odds with the plain language of the CBA.

Patriot emphasizes that Pyramid, and not Patriot, was the contracting party to the CBA, and that all of the contingent benefit obligations created in the CBA are defined in terms of monetary benefits received by Pyramid. This argument is half-true and misleading. The contingent benefits created in the CBA and CIA are based on monetary consideration received by the entity possessing the leasehold interest in the Reynolds property, but the agreement designates that entity as "Buyer" (not "Pyramid"), and clearly provides that "Buyer" includes Pyramid "and any contractor, subcontractor, sublessee, assignee, successor to any interest of Pyramid or DEW to Area I or Area III." Once the lease was assigned to Patriot, it clearly became the Buyer in place of Pyramid, and the contingent benefits owed Plaintiffs were defined in terms of the consideration received by Patriot (as "Buyer"/successor/assignee) for coal sales (among other things), establishing that the contingent benefits were intended to continue *after* the assignment of the lease. In addition to these provisions, several other parts of the CBA provide for payments based on coal sales into the future, notwithstanding the assignment of the lease to Patriot:

- The "Term" of the CBA (¶1, Joint App'x at 34) states that the CBA "shall continue until all Contingent Benefit Payments due hereunder are paid in full by Buyer relating in any way to coal produced and/or sold from Area III or other Reynolds properties in Henderson County, Kentucky in which Buyer has or acquires an interest." There is no end date, or the mention of any event that would terminate the duty to pay contingent benefits.

- ¶4(b), the provision that requires contingent benefit payments based on "other money consideration" received by "Buyer," requires such payment as the parties negotiate in good faith, with a minimum payment amounting to "the lesser of: (i) fifty percent (50%) of the monetary consideration received by Buyer, or (ii) the equivalent of one-half percent (0.5%) of the Gross Realization," as defined in the CIA. This contingent benefit requirement also provides no end date or specifies an event after which payments are no longer due.

- ¶7 provides for payment to Plaintiffs "on a monthly basis," and similarly states no time at which payment is no longer due.

- ¶14, "Binding on Successors," states that "This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, devisees, personal representatives, successors and assigns."

It is clear from these several terms, and the CBA's lack of any end date or terminating event, that the intent of Plaintiffs and Pyramid in entering the CBA was to provide contingent benefits to Plaintiffs so long as a profit was realized from the property involved in the Reynolds Lease. When Patriot was assigned the lease and the CBA, it took over responsibility for these payments, which the terms of the CBA clearly provide were defined in terms of its profits, as it became "Buyer" under the agreement.

Patriot also argues that the reward of contingent benefits from the time period *before* the assignment of the lease should be reversed, because it goes beyond the scope of benefits for profits from coal that Plaintiffs had sought. As Patriot points out, Plaintiffs sought to disclaim any such payments in their opposition brief filed at the summary judgment stage.[7] Plaintiffs counter that their complaint sought relief which included "the full amount of money to which the Plaintiffs are due in accordance with the provisions of the CIA and CBA." Further confusing the issue is the fact that while Plaintiffs disclaimed the right to pre-assignment contingent benefits, Patriot argued that contingent benefits *were* due for the time period before the assignment (and only from that time period). Thus, if Plaintiffs can be said to have waived their claim to pre-assignment damages through their summary judgment argument, Patriot could similarly be said to be estopped from arguing that such damages were not warranted, based on its earlier claim that contingent benefits were *only* owed for that time frame.

It is difficult to see how Patriot could have been prejudiced from Plaintiffs' failure to argue for pre-assignment payments when Patriot in fact made the argument for them. *See Stupak-Thrall v. Glickman*, 346 F.3d 579, 585 (6th Cir. 2003) (rejecting a waiver defense and noting that "the plaintiffs never claimed they were prejudiced or unfairly surprised by the government's failure to file a responsive pleading containing the affirmative defense."). The cases that Patriot cites on this point involve situations where a party failed to include a certain claim or prayer for relief in their pleadings, whereas Plaintiffs in fact included this claim in their complaint. *See Stewart v. Furton*, 774 F.2d 706, 710 (6th Cir. 1985). Neither party has cited, nor has independent research revealed, a case addressing waiver on a record as confused as this one, and we decline to make such a ruling here.

### C. Did the district court err in awarding prejudgment interest?

Pursuant to the magistrate's recommendation, the district court entered a judgment of $300,081 in prejudgment interest against Patriot, which included $252,332 of interest arising on its liability under the CBA for the assignment of the lease, and $47,749 for tax and fee deductions. The tax and fee deductions award was based on the prior panel's ruling that Patriot erroneously deducted taxes and related expenses before making royalty payments to Plaintiffs, requiring Patriot to compensate Plaintiffs for their percentage of the improperly deducted amounts, as well as the related interest. Patriot now challenges both of these interest awards.

In a diversity case, state law governs an award of prejudgment interest, and we review a district court's award of prejudgment interest for an abuse of discretion. *Conte v. General Housewares Corp.*, 215 F.3d 628, 633 (6th Cir. 2000). "Under Kentucky law, if the claim is liquidated, interest follows as a matter of right, but if it is unliquidated, the allowance of interest is in the discretion of the trial court." *Hale v. Life Ins. Co.*, 795 F.2d 22, 24 (6th Cir. 1986). The Kentucky Supreme Court has described the difference between liquidated and unliquidated damages by noting that

> Precisely when the amount involved qualifies as "liquidated" is not always clear, but in general "liquidated" means "made certain or fixed by agreement of parties or by operation of law." Black's Law Dictionary 930 (6th ed. 1990). Common examples are a bill or note past due, an amount due on an open account, or an unpaid fixed contract price.

---

[7] Patriot also claims that an answer to an interrogatory filed by Plaintiffs indicates that it only sought post-assignment contingent benefit payments, although this argument is not persuasive, as a separate portion of the response indicates that Plaintiffs sought payment for all coal sales without date restrictions, in fact supporting Plaintiffs on this point.

*Nucor Corp. v. General Electric Co.*, 812 S.W.2d 136, 141 (Ky. 1991).

Here, the district court adopted without significant comment the magistrate's report and recommendation on prejudgment interest. The magistrate did not definitively rule whether the contingent benefits due for the sale of the lease were liquidated or unliquidated. The contractual provision that controls the damages in question is again ¶4 of the CBA, which provides

> 4. (b) With respect to item (b) of Paragraph 3 hereof, Buyer and Sellers shall negotiate in good faith to determine the portion of the other monetary consideration which shall be payable as a Contingent Benefit to Sellers, provided however that the amount of the Contingent Benefit payable to sellers pursuant to item (b) of Paragraph 3 hereof shall be the lesser of (i) fifty percent (50%) of the monetary consideration received by Buyer, or (ii) the equivalent of one-half percent (0.5%) of the Gross Realization as defined in Paragraph 5 of the Contingent Interest Agreement from Area I for all coal sold to consumers.

According to the magistrate, this provision could be interpreted as either setting the amount pursuant to the formulas set forth in subparts (i) and (ii) and ignoring the "negotiate in good faith" provision, or reading the contract to allow the contingent benefit amount to be negotiated in good faith "provided it does not exceed the cap established by the formulas." Report and Recommendation at 12-13. Under the former view, the amount would be definite when payment was due, and thus liquidated; under the latter view, the amount would be negotiable and unliquidated. *Id.* The magistrate did not definitively rule on this question, reasoning that "under either interpretation the result would not change." *Id.*[8]

As the magistrate noted, the two relevant provisions here appear to be largely contradictory. The formula provisions do not provide a floor or a ceiling to the requirement that the parties negotiate in good faith. Instead of saying that the amount "shall be no more than," or "shall be no less than" the lesser of the two formula amounts, the agreement simply says that the payment "shall be the lesser of" the two amounts. Kentucky courts have held that "[i]f the contract contains inconsistent clauses, they should be reconciled if possible, but the clause contributing most essentially to the contract is entitled to the greater consideration; if they both cannot stand, the first will ordinarily prevail over the second." *North Star Co. v. Howard*, 341 S.W.2d 251, 255 (Ky. 1960). Given this rule, it seems that the two clauses can be reconciled by simply viewing the formula clause as an alternative way to set the contingent benefits where the parties do not negotiate a different amount in good faith. Here, because the parties were clearly unable to settle on an agreeable amount of contingent benefits, the amount would simply be governed by the lesser of the amounts from subparts (i) and (ii). Despite the confusion created by the apparently conflicting provisions, it seems clear that if Patriot or Pyramid refused to negotiate the amount of contingent benefit payments, Plaintiffs could have insisted on the lesser of the two formulaic amounts.

Alternatively, if the clauses cannot be reconciled, the formula clause contributes most essentially to the nature of the contract. The overriding theme of the CBA is that the Plaintiffs were giving up an interest in a potentially valuable coal mine, the profitability of which was likely to be unpredictable and variable. In doing so, they sought some assurance of future payment, for example by making the CBA continue for as long as coal was produced from the Reynolds property, and by making it binding on any successors or assigns. The idea that they would leave the payment open to negotiation with future unknown entities is more at odds with the nature of the contract than the

---

[8]Patriot now argues that this amounted to a ruling that the result was unliquidated, and that because Plaintiffs failed to object to this ruling in the report, they have waived the argument that the debt is liquidated. Given the equivocal nature of the magistrate's opinion, and the fact that Plaintiffs prevailed under both possible interpretations, there was little basis for Plaintiffs to object, and this waiver argument is unavailing.

idea that they would rely on set formulas, dependent on the future profitability of the mine. To the extent the parties' approach to the CBA in the course of litigation is relevant, they have both agreed that the contingent benefit payments should be determined based on the formulas, giving little meaning to the "negotiate in good faith" provision. For these reasons, we find that the formula governed the payment of contingent benefits, rendering Patriot's obligation liquidated, and entitling Plaintiffs to prejudgment interest as a matter of right.

The magistrate also ruled that the prejudgment interest for the deduction of taxes and fees was liquidated, based on the relevant provision in the CIA. Patriot does not contest this determination, but simply claims that the equities suggest that such interest is inappropriate. This argument finds no support in Kentucky law, and can be rejected out of hand. *See Nucor,* 812 S.W.2d at 141 ("When the damages are 'liquidated,' prejudgment interest follows as a matter of course."). Patriot relies on a statement in *Nucor* that "[w]e are not so much disturbed as to whether the claim is liquidated or unliquidated as we are, in accordance with the popular trend, as to whether justice and equity demand an allowance of interest to the injured party." *Id*. at 143. It takes this statement entirely out of context, however, as the Kentucky Supreme Court used it to explain that prejudgment interest on unliquidated claims can be justified based on equitable considerations, rather than the proposition that interest on liquidated debt does not follow as a matter of course. *Id*. In fact, the very next sentence, which Patriot omits, provides that "[i]t is with this in mind that there has been promulgated the rule that even on unliquidated claims allowance of interest is discretionary with the court." *Id*. Patriot's argument disingenuously misconstrues *Nucor*, and is unavailing.

### D. Was the interest rate of 5% excessive? (Patriot's appeal); Did the district court abuse its discretion in setting the prejudgment interest rate at 5% rather than 8%? (Plaintiffs cross-appeal)

Both parties challenge the rate of prejudgment interest on appeal, Plaintiffs claiming that the district court abused its discretion in setting the rate at 5%, rather than the 8% rate recommended by the magistrate. Patriot claims that even the reduced 5% rate is excessive. Here, the magistrate recommended an award of prejudgment interest at the rate of 8% based on his understanding of Kentucky law, as an appropriate means of compensating Plaintiffs for the unavailability of funds to which they were entitled since February 2000. The district court declined to adopt this rate, reasoning that "interest rates have been historically low over the relevant time period." D. Ct. Op., Jan. 26, 2005.

A review of Kentucky Supreme Court cases addressing the proper rate of prejudgment interest reveals two strands of cases. In cases involving unliquidated debts, "the trial court may award prejudgment interest at any rate up to 8%, or it may choose to award no prejudgment interest at all, but it may not exceed the legal rate of 8%." *Fields v. Fields*, 58 S.W.3d 464, 467 (Ky. 2001). On the other hand, where a debt is liquidated, a successful plaintiff is "entitled to interest at the legal rate of eight percent (8%) per annum." *Pursley v. Pursley*, 144 S.W.3d 820, 828 (Ky. 2004). The legal rate cited in *Pursley* is based on KRS § 360.010, which provides now, as it did at the time of the decision in *Pursley*, that "the legal rate of interest is eight percent (8%) per annum."

The appropriate interest rate thus turns on whether the two relevant obligations — the sale of the lease liability and the tax and fees deductions liability — were liquidated or unliquidated. The liability for tax and fees deductions was clearly liquidated, as the magistrate found, and even Patriot's consistently over-reaching attorney concedes. Further, for the reasons discussed above, we conclude that the sale of the lease liability is also liquidated based on the formula set forth in the CBA. In light of the liquidated nature of the entire judgment against Patriot, the district court did not have discretion under Kentucky law to assign a lower rate based on historically low interest rates. As such, we reverse this portion of the judgment, and remand for entry of an award of prejudgment interest at the rate of eight percent.

IV.

For the foregoing reasons, we affirm the district court's decisions except with regard to the prejudgment interest rate. Because Patriot's liabilities to Plaintiffs are all liquidated, an eight percent rate of prejudgment interest is required under Kentucky law. The case is remanded only to modify the rate of prejudgment interest accordingly.